868 A.2d 1087 (2005)
375 N.J. Super. 568
Andrew HOJNOWSKI, a minor, through his Parents and Guardians ad Litem, Jerry HOJNOWSKI and Anastasia Hojnowski, and Jerry Hojnowski and Anastasia Hojnowski, in their own right, Plaintiffs-Appellants,
v.
VANS SKATE PARK, Defendant-Respondent, and
v.
McCown DeLeeuw Company, Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted October 20, 2004.
Decided March 10, 2005.
*1089 Bafundo, Porter, Borbi & Clancy, Cherry Hill, for appellant (Robert A. Porter, on the brief).
Reilly, Supple & Wischusen, for respondent (Alex W. Raybould, on the brief).
Before Judges FALL, PAYNE and C.S. FISHER.
The opinion of the court was delivered by
PAYNE, J.A.D.
Plaintiffs Andrew Hojnowski, a minor, and his parents, Jerry and Anastasia Hojnowski, appeal from an order of the trial court dismissing without prejudice the personal injury complaint filed by the parents on behalf of Andrew and themselves against Vans Skate Park (properly known as Vans, Inc.) to permit an arbitration to take place under rules established by the American Arbitration Association (AAA). On appeal, plaintiffs argue that the pre-tort release signed by Anastasia Hojnowski on behalf of her son, which contains an arbitration provision as well as a limitation of liability, is not enforceable against the son. Its enforceability against the parents is not raised as an issue.
On January 3, 2003, Andrew Hojnowski, age twelve, fractured his femur while skateboarding at a skatepark facility operated by Vans. He has subsequently undergone two surgeries for the repair of the injury. In a complaint filed against Vans and its alleged corporate owner, plaintiffs claimed that Vans was liable for Andrew's injuries as the result of its negligent failure to supervise activities at the park, to control activities of aggressive skateboarders, to warn Andrew's parents that the activities of aggressive skateboarders would not be monitored, and to provide a safe place to skateboard.
Prior to Andrew's accident, on December 26, 2002, as a condition of use of the park, Andrew's mother executed on Andrew's behalf a document entitled "Release and Waiver of Liability and Jury Trial with Indemnity (For All Vans Skateparks, Stores and Facilities (Collectively, "Parks") in New Jersey)." The document commenced by stating:
Please read this document. It affects Your legal rights against Vans, Inc. if you are injured. Do not sign this document *1090 unless you understand it. If You are a minor, Your parent or guardian is required to sign this legal document.
Additionally, the document, at its conclusion, required a "yes" or "no" response to the following question: "Do You understand that You are giving up rights by signing this document if You are hurt?" Andrew's mother responded "yes" to this question.
The body of the document commenced with a description of the dangers of skateboarding, in-line skating and bicycle riding. It then set forth the following provisions of relevance to this litigation:
2. Can You Make A Claim For Money If You Are Injured?
If you are injured and want to make a claim, you must file a demand before the American Arbitration Association (the "AAA").... You agree that any dispute between You and Vans will be decided by the AAA. Vans, Inc. will pay all costs of the arbitration for You....
3. Vans Is Asking You To Give Up Legal Rights in Order to Enter This Park.
Because using Vans' Park ... may increase your risk of harm, Vans is asking you to give up certain valuable legal rights. Here are the rights you are giving up when you sign this document:
(a) You give up your right to sue Vans in a court of law.
(b) You give up your right to a trial by jury.
(c) You give up the right to claim money from Vans if you are injured unless Vans intentionally failed to prevent or correct a hazard caused by unsafe equipment or devices.
(d) You give up the right to claim money from Vans if you wait more than one year from the injury in order to make a claim.
(e) You give up the right to claim money from Vans, Inc. if you are injured by another person.
(f) You give up the right to recover damages to punish or make an example of Vans, Inc.
4. Rights You Do Not Give Up
You do not give up the right:
(a) To have safe equipment, structures and devices at the Park for Your intended use.
(b) To claim compensation for Your injury from Vans, Inc. if you are hurt because the equipment, structures and devices at the Park are not safe for Your intended use.
(c) To have a neutral arbitrator decide your rights fairly, quickly and completely.
* * *
5. Who is Bound By This Document?
You are bound by this document. Anyone who has or can obtain Your rights is also bound by this document, such as Your family, relatives, guardians, executors or anyone responsible for You....
6. Other Information Important For You To Know
You have the right to demand money if You believe Vans, Inc. intentionally caused You harm. If parts of this document are determined to be invalid, then that portion will be unenforceable and the remainder of the document will continue in full legal force and effect....
Following the institution of suit, Vans filed for commercial arbitration with the AAA. Plaintiffs then moved to enjoin the arbitration and to invalidate the pre-tort release signed by Andrew's mother. Vans cross-moved for summary judgment. The court granted Vans' motion, dismissing *1091 plaintiffs' complaint without prejudice[1] and ordering that the parties submit to arbitration. It made no ruling on the validity of the contract's limitation of liability, finding that the issue was within the jurisdiction of the arbitrator.
We are informed that the parties have selected as arbitrator a person with significant experience in tort law, thereby rendering irrelevant any argument by plaintiffs that the arbitration cannot proceed under the auspices of an organization whose focus is upon commercial matters  an argument that we find in any event to be factually unsupported.

I.
We construe the document executed by Anastasia Hojnowski on behalf of her son Andrew as bipartite, consisting of an agreement to arbitrate and a pre-tort liability waiver. We first address, as a matter entirely separate from the issue of the validity of the liability waiver, whether in the circumstances presented, a parent can enter into an enforceable contract, binding on the parent's minor child, that waives the right to trial by jury of the minor's bodily injury claims and requires submission of "any dispute" to arbitration. We hold that a parent has such power.
Public policy has long favored arbitration. See, e.g., Martindale v. Sandvik, 173 N.J. 76, 84-85, 800 A.2d 872, 876-77 (2002); Garfinkel v. Morristown Obstetrics & Gynecology Associates, 168 N.J. 124, 131, 773 A.2d 665, 669-70 (2001); Barcon Assocs. v. Tri-County Asphalt Corp., 86 N.J. 179, 186, 430 A.2d 214, 217 (1981) (discussing long history of arbitration); Jansen v. Salomon Smith Barney, 342 N.J.Super. 254, 257, 776 A.2d 816, 818 (App.Div.), certif. denied, 170 N.J. 205, 785 A.2d 434 (2001).
The ancient practice of arbitration "[i]n its broad sense, [] is a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law. The object of arbitration is the final disposition, in a speedy, inexpensive, expeditions and perhaps less formal manner, of the controversial differences between the parties."
[Garfinkel, supra, 168 N.J. at 131, 773 A.2d at 670 (quoting Carpenter v. Bloomer, 54 N.J.Super. 157, 162, 148 A.2d 497, 500 (App.Div.1959) (quoting Eastern Eng'g Co. v. City of Ocean City, 11 N.J. Misc. 508, 510-11, 167 A. 522, 523 (Sup.Ct.1933))).]
We read an agreement relating to arbitration liberally to find arbitrability if that is reasonably possible. Garfinkel, supra, 168 N.J. at 132, 773 A.2d at 673; Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282, 633 A.2d 531, 535 (1993); Jansen, supra, 342 N.J.Super. at 257-58, 776 A.2d at 818-19.
In this case, the agreement signed by Andrew's mother on his behalf provided that: "If you are injured and want to make a claim, you must file a demand before the American Arbitration Association." The agreement further eliminated the right to sue in a court of law. "A provision in a written contract to settle by arbitration a controversy that may arise therefrom... shall be valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of a contract." *1092 N.J.S.A. 2A:24-1.[2] The fact that the claim arises in tort, not contract, is immaterial. Garfinkel, supra, 168 N.J. at 137, 773 A.2d at 673; Jansen, supra, 342 N.J.Super. at 258, 776 A.2d at 819.
No New Jersey case has determined whether a parent, as a condition to her minor child's entry into a commercial recreational facility and participation in its activities, has the power to agree on behalf of that child that any claim for the minor's bodily injuries at the facility will be subject to arbitration. However the issue of the binding effect on non-parties of a contractual arbitration clause has been addressed. "[N]on-signatories of a contract ... may ... be subject to arbitration if the nonparty is an agent of a party or a third party beneficiary to the contract." Garfinkel v. Morristown Obstetrics & Gynecology Assoc., 333 N.J.Super. 291, 308, 755 A.2d 626, 636 (App.Div.2000), rev'd on other grounds, 168 N.J. 124, 773 A.2d 665 (2001) (quoting Mutual Benefit Life Ins. Co. v. Zimmerman, 783 F.Supp. 853, 865 (D.N.J.), aff'd, 970 F.2d 899 (3d Cir.1992)). See also Jansen, supra, 342 N.J.Super. at 261, 776 A.2d at 820-21.
"The principle that determines the existence of a third party beneficiary status focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement." Broadway Maintenance Corp. v. Rutgers, The State Univ., 90 N.J. 253, 259, 447 A.2d 906, 909 (1982). "[T]he real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts." Borough of Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 77, 11 A.2d 83, 85 (E. & A.1940). See also Restatement (Second) of Contracts § 302 (1979).
In this case, it is clear that Andrew's mother intended that Andrew benefit from the contract that she signed on his behalf. Indeed, her execution of the agreement had no purpose other than to gain for her son the benefit of entry into the skatepark. That the entry was conditioned upon a relinquishment of the right to trial and its replacement with the right to mandatory arbitration does not render the contract against public policy or otherwise avoidable.
The substitution of one forum for another, in and of itself, has never been declared against the public policy of this State.[3] We recognize that commentators have found fault with the arbitration process, focusing on concerns such as its cost, limitations upon discovery, the absence of an adequate evidentiary record to support the arbitrator's decision, the elimination of the right to a jury trial, and severe restrictions upon appellate review. See, e.g., Elizabeth G. Thornberg, Contracting with Tortfeasors: Mandatory Arbitration Clauses and *1093 Personal Injury Claims, 67 Law and Contemporary Problems 253 (Winter/Spring 2004).[4] Nonetheless, those complaints have not gained a foothold in New Jersey's jurisprudence. A "State interest in favoring arbitration" has instead been recognized. Martindale, supra, 173 N.J. at 85, 800 A.2d at 877. We perceive no rational basis for according additional weight in this case to the concerns enumerated by others, simply because the arbitration provision at issue governs the claims of a minor.
We derive support for our conclusion from Allgor v. Travelers Ins. Co., 280 N.J.Super. 254, 654 A.2d 1375 (App.Div.1995), although we recognize in that case that the benefit to the child was of greater significance than that accorded here, and the father's right to enter into a contract affecting the welfare of his son was concomitantly stronger. There, we found that a father's contractual agreement to submit underinsured motorist's (UIM) claims to arbitration bound his minor son, who sought UIM coverage as a family member, determining that he was a third-party beneficiary of the contract. We stated:
In this case, the optional nature of UIM benefits under N.J.S.A. 17:28-1.1b, and the absence of a statute exempting minors from arbitration, requires plaintiff's rights to be analyzed under contract principles. The third-party nature of plaintiff's benefits and his father's attempt to provide for plaintiff's welfare fully warrant binding plaintiff to the arbitration provision.
[Id. at 263, 654 A.2d at 1380.]
See also, e.g., Leong v. Kaiser Found. Hosp's, 71 Haw. 240, 788 P.2d 164, 169 (1990) (infant was bound by arbitration provision in contract for group medical services); Doyle v. Giuliucci, 62 Cal.2d 606, 43 Cal.Rptr. 697, 401 P.2d 1, 3 (1965) (same).
In reaching the conclusion to enforce the arbitration provision of the Vans contract, we choose not to follow the decision of the Florida District Court of Appeals in Shea v. Global Travel Marketing, Inc., 870 So.2d 20 (Fla.App.2003), review granted, 873 So.2d 1223 (Fla.2004), which held under Florida law that a contractual waiver by a mother of her son's right to sue a commercial safari operator for potential personal injury claims, and to subject them to arbitration, was contrary to public policy, but that a similar waiver relating to the activities of a non-profit entity would not be void. Id. at 25.
In Shea, as here, the waiver signed by the mother limited the liability of the safari company as well as subjected any claims against it to arbitration. The court's decision that the agreement was unenforceable was, in large measure, based upon the mother's waiver of remedies, not her choice of forum. The court never articulated why public policy disfavors arbitration, per se, in the context presented  a proposition for which we find no support in New Jersey precedent, which as we have recognized, strongly favors that form of alternative dispute resolution. We note additionally that the Shea court certified to the Florida Supreme Court the question of "whether a parent's agreement in a commercial travel contract to binding arbitration on behalf of a minor child with respect to prospective tort claims arising in the course of such travel is enforceable as to the minor." Because the Supreme Court has granted review and its decision remains pending, we cannot view the existing decision in Shea even as a dispositive statement of Florida law.
*1094 We recognize that a split of authority exists as to the resolution of cases such as these. See generally Douglas P. Gerber, Note, The Validity of Binding Arbitration Agreements and Children's Personal Injury Claims in Florida After Shea v. Global Travel Marketing, Inc., 28 Nova L. Rev. 167, 170-77 (Fall 2003) (discussing reported and unreported decisions). An unreported decision in Troshak v. Terminix Internat. Co., 1998 WL 401693 (E.D.Pa.1998) resembles Shea, in that it does not meaningfully distinguish between choice of forum and limitation of remedies in its holding that Pennsylvania courts, if they addressed the issue, would find that: "If a parent cannot prospectively release the potential claims of a minor child, then a parent does not have the authority to bind a minor child to an arbitration provision that requires the minor to waive their right to have potential claims for personal injury filed in a court of law." Id. at *5. We decline to follow Troshak for the reasons that we have previously expressed. Additionally, we distinguish between the effect of a waiver of forum that preserves all remedies and a consent to settlement, which a court must review for improvidence.
A number of the decisions finding a minor's claim to be non-arbitrable depend solely upon a determination that the contractual language did not include the minor within the arbitration provisions at issue. They are thus of no particular precedential value here. See Lewis v. CEDU Educ. Serv's, Inc., 135 Idaho 139, 15 P.3d 1147, 1151 (2000) (arbitration provisions applied only to contracting parties); Accomazzo v. CEDU Educ. Serv's, Inc., 135 Idaho 145, 15 P.3d 1153, 1156 (2000) (same); Ciaccio v. Cazayoux, 519 So.2d 799, 804 (La.Ct.App.1988) (mother had not signed arbitration agreement as representative of deceased children). Others decline to enforce contractual arbitration provisions against minors who are not third-party beneficiaries or do not seek to enforce the substantive provisions of the contract. See Fleetwood Enterprises, Inc. v. Gaskamp, 280 F.3d 1069, 1075 (5th Cir.2002) (children of mobile home buyers injured as the result of inhalation of formaldehyde were not bound by contract signed by parents that required arbitration of claims), op. supp. on denial of reh'g, 303 F.3d 570 (5th Cir.2002); Billieson v. City of New Orleans, 863 So.2d 557, 562-63 (La.Ct.App.2003) (parents of children suing as the result of the children's lead poisoning were not third-party beneficiaries of agreement to arbitrate between the City and its property management company), writ denied, 870 So.2d 303 (2004); Costanza v. Allstate Insurance Co., 2002 WL 31528447 at * 6-7 (Dist.Ct.E.D.La.2002) (children injured by water leakage were not seeking to enforce their rights under warranty contract, nor were they third-party beneficiaries of contract).
We find persuasive the language of the Court of Appeals of Ohio in Cross v. Carnes, 132 Ohio App.3d 157, 724 N.E.2d 828 (1998). In that case, governed by the Federal Arbitration Act, the producers of the Sally Jessy Raphael Show successfully sought to stay a court action by a child participant who sued on grounds of fraud and defamation when the child was portrayed on the show as a bully. In granting a stay to permit arbitration to proceed under an agreement signed by the child's mother on the child's behalf the court stated:
we note that the parent's consent and release to arbitration only specifies the forum for resolution of the child's claim; it does not extinguish the claim. Logically, if a parent has the authority to bring and conduct a lawsuit on behalf of the child, he or she has the same authority *1095 to choose arbitration as the litigation forum.
[Id. at 836.]
Significantly, plaintiffs do not argue that Andrew's mother did not understand the agreement that she signed, that she was coerced into signing it, or that unequal bargaining power between her and Vans precludes its enforcement. As a consequence, we find the agreement to arbitrate to be valid and enforceable in connection with the bodily injury claims asserted on Andrew's behalf. Nothing has been brought to our attention that persuades us that arbitration of personal injury suits by minors against recreational facilities should essentially be barred because the parent, not the child (who is legally incapable of doing so), consents to the forum.

II.
The motion judge limited her decision to the issue that we have just discussed, holding: "There's no determination by this Court on the merits of the request to invalidate the liability waiver, and that's for the arbitrators to determine." We find that conclusion to have been in error.
As a general rule, the scope of an arbitrator's authority is set by the issues that he or she is called upon to decide. United Serv's. Auto. Ass'n v. Turck, 156 N.J. 480, 486, 721 A.2d 1, 4-5 (1998); Berger v. First Trenton Indem. Co., 339 N.J.Super. 402, 406, 772 A.2d 28, 30 (App.Div.2001). Further, "[a]rbitrators in the private sector have broad discretion in determining legal issues" so long as they fall within the scope of the arbitration agreement. State of N.J., Dept. of Law and Pub. Safety, Div. of State Police v. State Troopers Fraternal Ass'n of N.J., Inc., 91 N.J. 464, 469, 453 A.2d 176, 179 (1982). "The essence of arbitration is, of course, that the arbitrators decide both the facts and the law." Daly v. Komline-Sanderson Engineering Corp., 40 N.J. 175, 178, 191 A.2d 37, 38 (1963).
In the present case, the arbitration agreement pertained to "any dispute between You and Vans." The language was thus sufficiently broad to encompass any issue regarding the construction of the contract itself. However, we find that the issue of whether Anastasia Hojnowski had the power and authority to limit the liability of Vans to her son Andrew for its negligence to be a matter of public policy, not contract interpretation.[5] Further, we hold that such power was lacking in this case, and thus that Anastasia's waiver of liability was ineffective to limit the claims asserted on Andrew's behalf to anything less than the law would allow.

III.
We commence our analysis of the waiver of liability signed by Anastasia Hojnowski with its terms, which we find to be broad in scope, ambiguous and potentially misleading. First, it appears that liability of any nature is restricted by the release to that arising out of an unsafe condition of "equipment, structures and devices," thereby precluding claims of liability arising out of conduct, however negligent. Further paragraphs 3(c) and 4(b) of the waiver appear to be internally inconsistent, since paragraph 4(b) preserves the right to compensation for injuries caused by unsafe equipment, structures and devices, but paragraph 3(c) inferentially excepts from liability Vans' negligent failure to prevent *1096 or correct a hazard caused by unsafe equipment or devices. Paragraphs 3(c) and 6, viewed together, suggest that Vans sought to immunize itself from all liability except that caused by intentional conduct on its part that is related to equipment or devices, since each of the two paragraphs specifically preserves only those claims arising out of intentional harm in that regard. Even then, punitive damages are precluded by paragraph 3(f). Injuries caused by "another person," regardless of circumstances or the identity of the person, are precluded by paragraph 3(e). The release, however construed, is thus far-reaching in its impact, diminishing substantially or eliminating any right of recovery by Andrew arising from negligence and exemplary damages arising from intentional acts that might otherwise be available to him.
It has long been the law of New Jersey that without statutory authority or judicial authorization, a parent has no ability to release a claim properly belonging to a child. Moscatello ex rel. Moscatello v. Univ. of Med. and Dentistry of N.J., 342 N.J.Super. 351, 360-61, 776 A.2d 874, 879-80 (App.Div.), certif. denied, 170 N.J. 207, 785 A.2d 435 (2001); Riemer v. St. Clare's Riverside Med. Ctr., 300 N.J.Super. 101, 110-11, 691 A.2d 1384, 1389 (App.Div.), certif. denied, 152 N.J. 188, 704 A.2d 18 (1997); Colfer v. Royal Globe Ins. Co., 214 N.J.Super. 374, 377, 519 A.2d 893, 894 (App.Div.1986) (citing precedent). See also R. 4:44-1 to -3; R. 4:48A. A purpose of this rule is to guard a minor against an improvident compromise of his rights, whether or not the claim has ripened or suit has been instituted. Colfer, supra, 214 N.J.Super. at 377, 519 A.2d at 894. See also Zukerman v. Piper Pools, Inc., 232 N.J.Super. 74, 96, 556 A.2d 775, 786 (App.Div.1989) (affirming the foregoing proposition). In Zukerman, we held that a parent may reject even a large settlement and proceed to a trial that may result in either a greater or lesser verdict, unless clear and convincing evidence demonstrates that a conflict exists between the parent's and the infant's positions or that the parent is otherwise incapable of effectively exercising judgment and discretion in the matter. Id. at 97, 556 A.2d at 786-87. However, that decision cannot be read to authorize a parent to forego any of the child's substantive rights to recovery. Simply put, no New Jersey statute, rule or decision authorized Andrew's mother to sign a pre-tort agreement limiting the liability of a tortfeasor to exclude negligent conduct in the circumstances of this case. In light of the protections afforded to the interests of minors in this State in connection with tort claims, family matters and otherwise, we will not here create the exception that the law has heretofore failed to recognize. Thus we declare that aspect of the agreement to have been void from its inception. The severability clause of the agreement preserves the agreement in other respects.
Like agreements to arbitrate the claims of minors, agreements waiving a minor's substantive remedies have been treated in varying fashions elsewhere. For decisions invalidating such waivers, see, e.g., Shea, supra, 870 So.2d at 25 (refusing to enforce parental waiver in commercial context); Cooper v. Aspen Skiing Co., 48 P.3d 1229, 1233-35 (Colo.2002) (invalidating prospective exculpatory provision on public policy grounds); Scott v. Pacific West Mtn. Resort, 119 Wash.2d 484, 834 P.2d 6, 11-12 (1992) ("[T]o the extent a parent's release of a third party's liability for negligence purports to bar a child's own cause of action, it violates public policy and is unenforceable."); Hawkins v. Peart, 37 P.3d 1062, 1065-66 (Utah 2001) (voiding release in horseback riding context on public policy grounds); Meyer v. Naperville *1097 Manner, Inc., 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411, 415 (1994) ("Since the parent's waiver of liability was not authorized by any statute or judicial approval, it had no effect to bar the minor child's (future) cause of action"); Munoz v. II Jaz Inc., 863 S.W.2d 207, 209-10 (Tex.Ct.App.1993) (the fact that the Texas Family Code empowers parents to make legal decisions concerning a child does not give them the right to waive a cause of action for personal injuries; such an interpretation would be against the State's public policy to protect minors); Rogers v. Donelson-Hermitage Chamber of Commerce, 807 S.W.2d 242, 245-46 (Tenn.Ct.App.1990) (a parent on behalf of a child cannot exculpate or indemnify an organization against liability); Simmons v. Parkette National Gymnastic Training Ctr., 670 F.Supp. 140, 144 (E.D.Pa.1987) (it is immaterial under Pennsylvania law that the release is also signed by the minor); Apicella v. Valley Forge Military Acad. & Jr. Coll., 630 F.Supp. 20, 24 (E.D.Pa.1985) ("Under Pennsylvania law, parents do not possess the authority to release the claims or potential claims of a minor child merely because of the parental relationship"); Doyle v. Bowdoin College, 403 A.2d 1206, 1208 n. 3 (Me.1979) (dictum; a parent cannot release a child's cause of action). Contra, Sharon v. City of Newton, 437 Mass. 99, 769 N.E.2d 738, 747 (2002) (validating release on basis of public policy favoring same, the fundamental liberty interest of parents in rearing their children, and the nonessential nature of the activity in which the child engaged); Zivich v. Mentor Soccer Club, Inc., 82 Ohio St.3d 367, 696 N.E.2d 201, 204-07 (1998) (finding no public policy violated by release, which was within parent's power to execute); Hohe v. San Diego Unified Sch. Dist., 224 Cal.App.3d 1559, 1564-65, 274 Cal.Rptr. 647, 649 (1990) (a parent may contract on behalf of a child).
We find three arguments raised in the preceding cases to merit further discussion. First, we note the argument, expressed in decisions such as those in Sharon, supra, and Zivich, supra, that a parent can release the tort claims of a child as the result of the parent's fundamental right to make decisions that bear upon the care, custody and upbringing of their children. 769 N.E.2d at 746. Although we acknowledge that fundamental right to exist, as we must (see, e.g. Troxel v. Granville, 530 U.S. 57, 65-66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56-57 (2000)), we do not read the precedent defining that right (as does our colleague) as encompassing a decision such as this to forego substantial tort remedies, a decision that we find to be different from such fundamental concerns as establishment of a home, upbringing and education, religion, or medical care. See, e.g., Parham v. J.R., 442 U.S. 584, 604, 99 S.Ct. 2493, 2505, 61 L.Ed.2d 101, 120 (1979)(mental hospital institutionalization); Moore v. East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935-36, 52 L.Ed.2d 531, 537 (1977) (family living arrangements); Wisconsin v. Yoder, 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15, 24 (1972) (freedom of religion in light of compulsory education); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558-59 (1972) (termination of parental rights); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1077-78 (1925) (private schooling); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923) (teaching of modern languages). Were it otherwise, existing restrictions on parental conduct in the context of litigation involving minors would long ago have been abrogated in New Jersey.
Our colleague would find a mother's decision to allow her son to skateboard at a Vans commercial facility "conditioned *1098 upon giving Vans a pre-tort release" to be constitutionally protected by the Due Process Clause as an aspect of the constitutional right of a parent to raise a child as the parent deems appropriate. We agree with our colleague that a parent has a constitutionally protected right to direct the activities in which a child may engage. Indeed, this is the thrust of the United States Supreme Court cases that we have cited and upon which our colleague relies, as well as the New Jersey Supreme Court precedent that he cites. However, we disagree that a parent's authority to relinquish a child's tort claims is similarly protected. No decision by the United States or New Jersey Supreme Court has recognized that right. Our colleague's sole direct support is derived from the decisions by courts of other states in Sharon, supra, and Zivich, supra, which we choose not to follow, finding no support for their reasoning in authorities we regard as persuasive and controlling.
An additional argument is raised that a pre-tort release can be distinguished from a post-injury one, because the pressures on the parent, post-tort, to accept an inadequate settlement, the possibility of parental dishonesty, and the potential existence of indemnification agreements placing the burden of payment on the parent[6] do not exist in a pre-tort context. Before the tort occurs, the argument continues, the parent's determination to sign a release is tempered by the knowledge that if injury takes place, medical expenses will become the parent's responsibility. See Angeline Purdy, Note, Scott v. Pacific West Mountain Resort: Erroneously Invalidating Parental Releases of a Minor's Future Claim, 68 Wash. L. Rev. 457, 472-75 (1993). Purdy has postulated that a parent is less vulnerable to coercion in a preinjury setting because the "parent has time to examine the release, consider its terms, and explore possible alternatives. A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue." Id. at 473-74.
We are unwilling to rest our decision on such prescience on the part of a parent, accompanied by an importunate child, finding no evidence that such a parent rationally calculates the risk of injury to the child or its economic cost before bowing to the child's request for entry into a craved pleasure ground and signing the release of liability upon which that entry is conditioned. The coercive pressures exerted by children in this context are ones that any parent has experienced.
We therefore find that although the forces influencing a parent's decision-making before and after a child has been injured differ, those forces remain in each setting. Thus, a public interest in judicial intervention remains.
Purdy's argument was met, we believe effectively, by the Court in Cooper, which stated:
We do not find these distinctions meaningful or persuasive, however. It may be true that parents in the pre-injury setting have less financial motivation to sign a release than a parent in the post-injury setting who needs money to care for an injured child. Nonetheless, the protections accorded minors in the post-injury setting illustrate Colorado's overarching policy to protect minors, *1099 regardless of parental motivation, against actions by parents that effectively foreclose a minor's right of recovery. Thus, while a parent's decision to sign a pre-injury release on his child's behalf may not be in "deliberate derogation of his child's best interests," Purdy, supra, at 474, the effect of a release on the child in either the pre-injury context or the post-injury one is the same. If parents are unwilling or unable to care for an injured child, he may be left with "no recourse against a negligent party to acquire resources needed for care and this is true regardless of when relinquishment of the child's rights might occur." Scott, 834 P.2d at 12. In addition, while pre-injury releases might be less vulnerable to mismanagement, children still must be protected against parental actions  perhaps rash and imprudent ones  that foreclose all of the minor's potential claims for injuries caused by another's negligence.
[48 P.3d at 1234.]
A concern also exists that a decision precluding a pre-tort waiver of a minor's rights by a parent will unnecessarily interfere with beneficial school and recreational activities and with athletic events. See Sharon, supra, 769 N.E.2d at 747; Shea, supra, 870 So.2d at 25; Zivich, supra, 696 N.E.2d at 205; Simmons, 670 F.Supp. at 144-45. See also, e.g., Allison M. Foley, Note, We, the Parents and Participant, Promise Not to Sue ... Until There is an Accident. The Ability of High School Students and Their Parents to Waive Liability for Participation in School-Sponsored Athletics, 37 Suffolk U. L. Rev. 439 (2004); Richard B. Malamud and John E. Karayan, Contractual Waivers for Minors in Sports-Related Activities, 2 Marq. Sports L.J. 151 (1992). The concern is of course a legitimate one. Nonetheless, we find a significant measure of protection to exist in an noncommercial context as the result of statutes such as the Charitable Immunity Act, N.J.S.A. 2A:53A-7 and the Tort Claims Act, N.J.S.A. 59:1-1 to 14-4, and the civil immunity provided to volunteer coaches, managers and officials for non-profit and county or municipal recreational sports teams by N.J.S.A. 2A:62A-6 to -6.2, and to trustees, directors, officer and voluntary members of non-profit organizations by N.J.S.A. 2A:53A-7.1.
In a skateboard context, we do not find, as does our colleague, that the "law's solicitude for the rights of children" has been unjustifiably "exalted over the public's interest in the continued viability of businesses that make available places for such sporting activities." We view children to trump economic concerns such as these. We are aware of no public policy that requires the law to provide facilities such as that operated by Vans with an environment from which to operate a business apparently free from the risk of litigation except in the most egregious of cases.
Nor are we persuaded that, in the context of this litigation, we are equipped with the facts that would enable us to determine that skateboarding outside a facility such as Vans is so unsafe that the Vans of this country must be legally protected at the expense of a minor's tort rights in the manner that our colleague sets forth. The record contains nothing with respect to the comparative dangers of skateboarding in various venues. To be sure, reported cases can be utilized to create a parade of horribles. However, we lack any evidence by which we can compare the incidence, circumstance or severity of injuries in skateboard facilities of various types to injuries sustained elsewhere. If, as our colleague postulates, skateboarding is indeed more dangerous when conducted in the streets and a valuable resource providing a safe venue for the sport will be faced *1100 with economic extinction as the result of this decision, then the Legislature can be apprised of that fact and can act, as it has to protect other industries that it deemed to be both important and threatened.
We note in this context the protections against liability for dangers inherent in the sport that already have been afforded to certain other commercial enterprises by the provisions of N.J.S.A. 5:13-1 to -11, governing skiing, tobogganing and sledding; the New Jersey Roller Skating Rink Safety and Fair Liability Act, N.J.S.A. 5:14-1 to -7[7]; and N.J.S.A. 5:15-1 to -12, governing equestrian activities. If the Legislature regards our decision relating to child skateboarders as contrary to any manifestation by it of a willingness to render participants solely responsible for injuries resulting from the inherent risks of this or any other sport, the Legislature remains free to act.
We do not, as a matter of principle, reject the proposition that a parent should be empowered to permit a child to engage in activities that are accompanied by a degree of inherent risk. What we hold here is that the parent should not, at the same time, be able to waive the child's claim based on negligence. An issue arises in this context as to whether the parent should be permitted to waive liability for those injuries arising as the result of a danger inherent to the sport of skateboarding or any other sport. We see nothing to be gained by that process, so long as assumption of the risk remains as a defense to any claim of liability. We reach this conclusion, in part, because we find it impossible to define as a matter of law what constitutes a danger inherent to a sport that could definitively be encompassed in a waiver. Such a determination must be made on a case-by-case basis after full consideration of the factual circumstances giving rise to the injury. As a consequence, the existence of a waiver by a parent of this type of liability will not serve to lessen litigation. A determination will still be required by a judge or arbitrator whether the facts support the imposition of liability.
Moreover, we regard utilization of the doctrine of assumption of the risk to provide a better means for sorting out the liability of the parties than waiver, since a negligence-based defense has a greater potential for nuanced application and, when appropriate, utilization of concepts of comparative negligence. It further holds the potential for influencing the conduct of Vans and other skateboard facilities in a manner designed to minimize the risk of injury to skateboarders such as Andrew, while protecting it from liability for self-induced injury.
We thus return, as the bedrock of our decision, to the principle that the judiciary must stand as guardians of the State's children in the context of this case. As the Court stated in Cooper, supra,
To allow a parent or guardian to execute exculpatory provisions on his minor child's behalf would render meaningless for all practical purposes the special protections historically accorded minors. In the tort context especially, a minor should be afforded protection not only from his own improvident decision to release his possible prospective claims for injury based on another's negligence, but also from unwise decisions made on his behalf by parents who are routinely asked to release their child's claims for liability.

*1101 [48 P.3d at 1234.]
Were we to decide otherwise, we would be relieving an alleged wrongdoer from its traditional legal responsibility to provide compensation for injuries caused by its negligence and shifting the economic burden to families, public welfare agencies and private charities without any concomitant benefit to either an injured child or his parents. Cf. Gershon v. Regency Diving Ctr., Inc., 368 N.J.Super. 237, 249, 845 A.2d 720, 727-28 (App.Div.2004).
We therefore void the release at issue because it limits the tort remedies available to Andrew to less than the law, if unfettered, would otherwise allow.[8] We do not, however, foreclose to Vans any defenses available to it under the facts and the common law, including assumption of the risk. See Del Tufo v. Twp. of Old Bridge, 147 N.J. 90, 112-13, 685 A.2d 1267, 1278-79 (1996).
Affirmed in part; reversed in part. The matter is referred to the arbitrator for further proceedings consistent with this opinion.
FISHER, J.A.D., concurring in part and dissenting in part.
So her twelve-year old son Andrew Hojnowski (Andrew) could utilize a skateboarding facility owned and operated by defendant Vans Skate Park (Vans), plaintiff Anastasia Hojnowski (Anastasia) executed, on December 26, 2002, a document that purported to release certain future tort claims and to require arbitration of any unreleased claims. Andrew was injured while skateboarding at Vans' facility on January 3, 2003, prompting his parents to file a complaint in the Law Division.
While the trial judge concluded, by way of Vans' motion, that the arbitration provision was enforceable, the judge also declined to determine whether any of the claims were barred by the release leaving, instead, those issues to be resolved by the arbitrator. This appeal followed.

I
In Section I of the majority opinion, my colleagues have found enforceable the provisions that contain the waiver of a trial by jury and the consent to arbitration. While I agree, I do so because  as more fully explained below in the discussion concerning the release provisions also contained in the agreement  I believe that, in the absence of legislatively-imposed limits, our courts should defer to a parent's decisions in such matters.
In Section II, the majority has held that the trial judge should have considered the validity of the release provisions. I also agree that, in determining the scope of the arbitrator's authority, the trial judge should have resolved the purely legal question of whether a parent's execution of a release of a child's future tort claims, in these circumstances, was void against public policy. As my colleagues correctly observe, Anastasia did not argue either that she failed to understand the document she signed, that she was coerced into signing it, or that there was an imbalance of bargaining power that might impact upon the enforcement of the release. I would add that there is nothing about the physical appearance of the document or the language utilized by its drafter that would call into question its enforceability.[1] The size of the print was adequate to give notice of *1102 its content and purpose, and the terms were expressed in simple and plain English. Accordingly, I agree with the majority's holding that the trial judge should have determined whether the pre-tort release was enforceable.
It is at that point, however, that I part company and respectfully disagree with Section III of the majority's opinion. My disagreement lies largely with my belief that, in the absence of parental unfitness, courts should not overrule parental decisions but should instead defer to a parent's own weighing of the benefits and risks when entering into agreements that relate to the activities of their children. In essence, I believe we should enforce pre-tort releases executed by parents on behalf of their children to the same extent we would enforce pre-tort releases signed by adults regarding their own claims.

II
While the factual record is somewhat sketchy, I would infer from the circumstances that Andrew was a skateboarding enthusiast and his mother, in permitting Andrew to pursue the sport, sought a place more suitable than the streets, sidewalks and driveways of their community for Andrew to hone his skills and enjoy the sport. To obtain permission to use Vans' facility, Anastasia was required to sign the document in question. Since Anastasia has not claimed that she did not understand the agreement, and since there is nothing in the record to suggest that her execution of the agreement was not free and voluntary, it must also be assumed that Anastasia weighed the benefits and detriments of the transaction. By upholding Anastasia's waiver of the right to trial by jury, her waiver of the right to seek relief in a court of law, and her agreement to arbitrate any disputes, the majority has determined, and I agree, that Anastasia could, under these circumstances, validly consent to limit the legal rights that Andrew possessed. But the majority has also determined  notwithstanding Anastasia's free, voluntary and knowing execution of the document, and notwithstanding the enforceability of the waiver of some rights through the execution of the document  that public policy precludes the enforceability of the pre-tort release. Because it is only solicitous of Andrew's tort claims, I believe the majority opinion has failed to account for other valid, competing policies of interest to the public and, indeed, has adopted a principle that may prove more harmful than beneficial to skateboarding minors. In addition, the majority's hostility toward pre-tort releases, when applied to minors, is at odds with our Legislature's willingness to render participants solely responsible for injuries resulting from the inherent risks of similar activities.
I disagree with the majority's opinion because I believe the pre-tort release signed by Anastasia should not be invalidated. I believe this to be so because (a) a parent can legally execute a contract that binds a child, (b) the pre-tort release executed here would be upheld if invoked to avoid a suit based on an adult's personal injuries, (c) a parent has the constitutional right to make decisions regarding the upbringing of a child which  despite all good intentions  we should not interfere with, (d) there are unaccounted countervailing public policies that, in my view, override the policy exalted in the majority's opinion, and (e) the pre-tort release does not overreach but, instead, secures only the waiver of the child's claims to injuries resulting from his assumption of the risks inherent in skateboarding, and, therefore, is in harmony with the policies endorsed by our Legislature in enacting laws that govern similar sporting activities.

*1103 A
Absent the overriding public policy that the majority has announced, there is no legal reason why a parent cannot enter into an agreement that releases a child's claim before it accrues, as occurred here. A parent has the right to enter into contracts on a child's behalf. In fact, the majority, in upholding the arbitration provision and the waiver of a trial by jury, has so held. Thus, any limitation on the right of a parent to contractually affect a child's interests comes not from contract law nor has that power been limited by the Legislature.
In considering the basis for the majority's ruling, I do recognize that a court may, with the exercise of great caution, withhold its power to enforce a contract when warranted by a compelling and plainly apparent public policy. See, e.g., Sparks v. St. Paul Ins. Co., 100 N.J. 325, 334-35, 495 A.2d 406, 411-12 (1985). But I believe it is important to emphasize that it is only in the potentially murky area of what does or does not conform to public policy  an area into which we should tred with caution, Allen v. Commercial Cas. Ins. Co., 131 N.J.L. 475, 478, 37 A.2d 37, 39 (E. & A.1944), because, in so doing, we infringe upon the parties' common law freedom of contract  where an obstacle to the enforcement of this pre-tort release lurks.

B
It is also, in my view, important to emphasize that public policy is not hostile to the enforcement of pre-tort releases that are given in similar circumstances. The pre-tort release in question  if executed by an adult for the adult's use of the skateboarding facility  would undoubtedly be deemed valid. Such pre-tort releases are normally invalidated only when their execution is demanded in exchange for the released party's providing of a necessary service or commodity of great import, where the released party is under a public duty to exercise care, or where the parties are in grossly disproportionate bargaining positions. See Mayfair Fabrics v. Henley, 48 N.J. 483, 487, 226 A.2d 602, 604-04 (1967); McBride v. Minstar, Inc., 283 N.J.Super. 471, 490, 662 A.2d 592, 601-02 (Law Div.1994), aff'd o.b. sub nom, McBride v. Raichle Molitor, USA, 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995). In this sense, a court should not enforce a pre-tort release when, for example, it is demanded by a hospital prior to treating a patient, Tunkl v. Regents of Univ. of Calif., 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963), or when included in a residential apartment lease by a landlord possessing superior bargaining power, Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 111 A.2d 425 (App.Div.1955).
Here, the pre-tort release was requested of Anastasia in exchange for permitting Andrew to use Vans' facility. The right to skateboard in a privately-owned facility is not a "necessity" nor may any patron seeking admittance be assumed to be in a grossly disproportionate bargaining position. Patrons that do not approve of such an agreement's terms may simply depart and skateboard elsewhere. See McBride, supra, 283 N.J.Super. at 491, 662 A.2d at 602. As a result, the courts of most states, including this State, have upheld exculpatory agreements of various types when executed in connection with a person's participation in sporting activities, see, e.g., Mario R. Arango and William R. Trueba, Jr., The Sports Chamber: Exculpatory Agreements Under Pressure, 14 U. Miami Ent. & Sports L. Rev. 1, 7 n. 26 (1997), so long as the operator does not seek to insulate itself from a standard of care imposed by statute or regulation, see McCarthy v. Nat'l Ass'n for Stock Car Racing, *1104 Inc., 48 N.J. 539, 543, 226 A.2d 713, 715 (1967).[2] I would conclude that this pre-tort release would be enforceable if applied to a claim based on an adult's injuries. Indeed, the point need not be belabored since I do not understand my colleagues to suggest otherwise.

C
Instead of following the principles set forth above, the majority concludes that the present circumstances differ because the injured suitor is a child and not an adult. While this fact may require consideration, I would nevertheless enforce a pre-tort release executed by a parent in this and other similar circumstances. That is, I disagree with my colleagues because I believe insufficient weight has been given to a parent's right to make decisions regarding the upbringing of a child.
The Supreme Court of the United States has determined that the right of a parent to decide how a child will be raised is one of the oldest and most fundamental rights emanating from the "liberty" interest of the Due Process Clause. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 56 (2000); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1077-78 (1925); Meyer v. Nebraska, 262 U.S. 390, 399-401, 43 S.Ct. 625, 627, 67 L.Ed. 1042, 1045 (1923). In Troxel, the Court acknowledged its long history of recognizing that the family is a unit within which parents possess "broad ... authority over minor children." 530 U.S. at 66, 120 S.Ct. at 2060, 147 L.Ed.2d at 57 (quoting Parham v. J.R., 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 118 (1979)). Our own Supreme Court, in adhering to these decisions, has shown equal respect for a parent's constitutional right to the care, custody and control of a child. Sacharow v. Sacharow, 177 N.J. 62, 79, 826 A.2d 710, 721 (2003) ("To be certain, both parents have a fundamental right to the care and custody of their children."); Watkins v. Nelson, 163 N.J. 235, 245, 748 A.2d 558, 563-64 (2000) ("[T]he right of natural parents to the custody, care and nurturing of their children has risen to the stature of a fundamental right and deserves special protection."). This fundamental right should be kept free of governmental intervention, even when well-intended, unless there has been "gross misconduct, abandonment, unfitness or the existence of `exceptional circumstances.'" Id. at 237, 748 A.2d at 559. Among many other things, a parent possesses the basic right to make medical decisions for a child, including, at least in that context, the giving of consent to the child's release of a battery claim. See, e.g., Zivich v. Mentor Soccer Club, Inc., 82 Ohio St.3d 367, 696 N.E.2d 201, 206 (1998). No doubt thousands of such decisions are made by the parents of New Jersey's children every day. A parent also has the right to permit or deny a child's participation in any or all of the recreational activities that may be available. We defer to a parent's decisions over a *1105 child's desires because we presume the parent possesses superior judgment and wisdom in such matters. See Parham, supra, 442 U.S. at 602, 99 S.Ct. at 2504, 61 L.Ed.2d at 118 ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions."). In adhering to this approach, I believe our courts should defer to parental decisions in these circumstances.
Accordingly, I strenuously reject the majority's position that the constitutional right of parents to raise children as they deem appropriate extends only to "such fundamental concerns as establishment of a home, upbringing and education, religion, or medical care." I believe a parent also has the right  with which the state must not interfere  to decide whether a child may play football or collect sea shells, learn to ride a horse or engage in birdwatching, go skateboarding or only play video games involving animated skateboarders, or engage in any other type of sport or recreational activity that encompasses inherent risks, or those that are sedate, or all such activities, or none. The majority may not view these matters as important, but, important or not, they and countless others ought to be resolved solely within the sphere of the family and, absent the parents' unfitness, it should be beyond our courts' power to say otherwise. To the extent the majority has determined that Anastasia's decision to allow Andrew to skateboard at Vans' facility, conditioned upon executing a pre-tort release, is not the type of decision protected by the Due Process Clause, I wholeheartedly disagree. While the majority's decision stands on the declared principle that the members of "the judiciary must stand as guardians of the State's children in this context," my view is that, absent proof of unfitness, the guardians of this State's children ought to remain their parents.
Considering the great importance of the constitutional right to raise a child as a parent deems appropriate, I would not overrule a parent's decision to allow a child to participate in an inherently risky sporting activity in exchange for the forfeiting of a tort claim emanating from the child's assumption of the sport's inherent risks.[3] Those decisions from other jurisdictions cited by the majority[4] that invalidate the application of pre-tort releases to the claims of children are, in my view, incompatible with this important constitutional right. See Joseph H. King, Jr., Exculpatory Agreements For Volunteers In Youth Activities  The Alternative To "Nerf" Tiddlywinks, 53 Ohio St. L.J. 683, 716 (1992) ("[J]udicial attitudes toward exculpatory agreements signed by parents on behalf of their minor children seem inconsistent with the powers conferred on parents respecting other important life choices."). Rather than join with those decisions, I would follow the decisions of sister states that have recognized the superior authority of parents, granted to them by the Due Process Clause, to make decisions of the type made here. See *1106 Sharon v. City of Newton, 437 Mass. 99, 769 N.E.2d 738 (2002); Zivich, supra, 82 Ohio St.3d 367, 696 N.E.2d 201; Hohe v. San Diego Unified Sch. Dist., 224 Cal.App.3d 1559, 274 Cal.Rptr. 647 (1990); see also King, supra, 53 Ohio St. L.J. 683; Stephanie Ross, Interscholastic Sports: Why Exculpatory Agreements Signed by Parents Should Be Upheld, 76 Temp. L. Rev. 619 (2003); Robert Nelson, The Theory of the Waiver Scale: An Argument Why Parents Should Be Able to Waive Their Children's Tort Liability Claims, 36 U.S.F.L. Rev. 535 (2002); Angeline Purdy, Scott v. Pacific West Mountain Resort: Erroneously Invalidating Parental Releases of a Minor's Future Claim, 68 Wash. L. Rev. 457 (1993).
I also disagree with the majority's holding that our interest in the fairness of a parent's pre-tort decision is the same as the judiciary's interest in overseeing a parent's post-tort decisions. In this regard, I do not mean to suggest that the judiciary's interests in the well-being of litigants who are minors should be reduced or eviscerated. Instead, contrary to the majority's view, I believe that the circumstances that attach to a parent's decision-making after the child has been injured are far different from those presented prior to the accrual of a cause of action. In stating otherwise, the majority has relied upon and quoted at length a Colorado decision, where the court found this distinction to be neither "meaningful [n]or persuasive." Cooper, supra, 48 P.3d at 1234. In my view, the Colorado court's decision was misguided and unrealistic because there is a palpable conflict between the financial interests of the parent and the financial interests of the child once a cause of action accrues, whereas there is no rational conflict when a parent decides whether to execute a pre-tort release. In this regard, I agree with the following views of one commentator on the particular subject:
The concerns underlying [some courts'] reluctance to allow parents to dispose of a child's existing claim do not arise in the situation where a parent waives a child's future claim. A parent dealing with an existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child's ultimate best interests. A parent who signs a release before her child participates in a recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release....
Moreover, parents are less vulnerable to coercion or fraud in a preinjury setting. A parent who contemplates signing a release as a prerequisite to her child's participation in some activity faces none of the emotional trauma and financial pressures that may arise with an existing claim. That parent has time to examine the release, consider its terms, and explore possible alternatives. A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue.
[Purdy, supra, 68 Wash. L. Rev. at 473-74.]
Accord Sharon, supra, 769 N.E.2d at 747 n. 10; Zivich, supra, 696 N.E.2d at 206; see also Zukerman v. Piper Pools, Inc., 232 N.J.Super. 74, 98, 556 A.2d 775, 787 (App.Div.1989) (finding an absence of a conflict of interest, even after the commencement of suit, when a parent, who acted as guardian ad litem for his injured child and who also had pleaded and pursued *1107 his own claim; in reversing the trial judge's removal of the parent as guardian ad litem, we observed that the parent had supported the child since birth and would presumably continue to do so regardless of the outcome of the suit, and, accordingly, it would be "inappropriate for any court to presume that it knows better than the parents what is in the best interests of [their] child.").
Contrary to the majority's holding, I would conclude that there is often, if not always, a very real conflict once the child's cause of action accrues and that this conflict justifies judicial examination of any substantive decisions thereafter made by the parent on the child's behalf. That is the reason we have repeatedly held that once an injury occurs, a parent may not release or settle the child's claim without judicial approval. Moscatello ex rel. Moscatello v. Univ. of Med. and Dentistry of N.J., 342 N.J.Super. 351, 360-61, 776 A.2d 874, 879-80 (App.Div.), certif. denied, 170 N.J. 207, 785 A.2d 435 (2001); Riemer v. St. Clare's Riverside Med. Ctr., 300 N.J.Super. 101, 110-11, 691 A.2d 1384, 1389 (App.Div.), certif. denied, 152 N.J. 188, 704 A.2d 18 (1997); Colfer v. Royal Globe Ins. Co., 214 N.J.Super. 374, 377, 519 A.2d 893, 894 (App.Div.1986). On the other hand, there is no conflict between parent and child when a parent decides to execute a pre-tort release in order to permit the child to participate in such an activity and, thus, there is no legitimate public interest in having the judiciary intervene in, or override, such a decision. Indeed, it is interesting to observe that this court has shown more deference to the decisions of a parent to settle or not settle a child's pending claim than the majority has given to Anastasia's pre-tort decisions. See, e.g., Zukerman, supra, 232 N.J.Super. at 95-97, 556 A.2d at 785-87.[5]

D
The public policy that has led the majority to conclude that a pre-tort release may not validly bar a child's personal injury claim is the law's solicitude for the rights of children. That is certainly a laudable consideration that should not be discounted,[6] but here it has been exalted over the *1108 public's interest in the continued viability of businesses that make available places for such sporting activities. In refusing to permit a parent to waive a child's future tort claim, I believe the majority has failed to appreciate the impact this decision may have upon the operators of such facilities and, indeed, upon other children such as Andrew.
The result of the majority's decision may be the inability of operators of such facilities to profitably stay in business. It may be expected that with the evisceration of pre-tort releases, a facility such as Vans may anticipate an increase in insurance premiums, or an unavailability of liability insurance, that may render its business unprofitable.[7] In addition, it is unlikely this economic impact could be overcome by excluding children and allowing only adults into the facility. The vast majority of skateboarders are minors[8] and, thus, barring their admission would undoubtedly lead to a precipitous decline in such a facility's income.
Extrapolating further, the barring of minors from such facilities would cause their return to the streets, driveways and sidewalks in their communities, where the dangers to themselves and others are undoubtedly greater than in the controlled setting of a skateboard facility. See, e.g., Rosen v. Knaub, 175 Ariz. 329, 857 P.2d 381 (1993) (skateboarder hit by truck on a residential street at night); Calhoon v. Lewis, 81 Cal.App.4th 108, 96 Cal.Rptr.2d 394 (2000) (skateboarder impaled on metal pipe located in a planter in a friend's driveway); Bartell v. Palos Verdes Peninsula Sch. Dist., 83 Cal.App.3d 492, 147 Cal.Rptr. 898, 899 (1978) (12-year old fatally injured while playing a skateboard version of "crack the whip" on a school playground after hours); Plante v. Hinton, 294 A.D.2d 679, 742 N.Y.S.2d 159 (2002) (during Memorial Day parade, a skateboarder's maneuver startled a mule team, causing the mule-pulled wagon to tip over; as a result, a four-year old passenger of the wagon was dragged face first on asphalt for 50 to 60 feet); Miller v. Likins, 109 Wash.App. 140, 34 P.3d 835 (2001) (14-year old skateboarder struck by a car on a curve in a poorly-lit road at night); Elaine Marie Tomko, Annotation, Liability of Motorist for Injury to Child on Skateboard, 24 A.L.R. 5th 780 (1994).[9] The majority's advancement of a public policy in favor of the right of a child to seek a tort remedy assumes that the choice presented is between the child having access to such a *1109 facility with a right to sue and the child having access to such a facility without a right to sue. In fact, the choice we may very well be making is between the child having access to such a facility without a right to sue and no such facility at all.[10]
The majority asserts that there is no evidence to suggest that such recreational facilities would be lost if operators cannot protect themselves through pre-tort releases. My first response is that this evidence may very well come in the form of closed businesses in the near future. For example, as Judge King recognized in Calhanas v. South Amboy Roller Rink, 292 N.J.Super. 513, 518, 679 A.2d 185, 187 (App.Div.1996), the New Jersey Roller Skating Rink and Fair Liability Act (the Roller Skating Act), N.J.S.A. 5:14-1 to -7, was passed in response to the decline of roller skating rinks both in this State (from 50 such facilities in 1981 to 21 in 1991) and nationwide (from 2,400 in 1975 to 1,150 in 1991). While similar evidence is not presently available regarding what may become of skateboarding facilities in the absence of the Legislature's protection, if they cannot contractually limit their liability, the majority's blanket invalidation of pre-tort releases in this setting may very well generate the type of evidence it presently seeks.
Secondly, I believe the evidence the majority claims is now absent can be found in our Legislature's findings in enacting the Roller Skating Act. While I agree that the Act does not expressly govern the rights and liabilities of the parties to this case, see N.J.S.A. 5:14-3(b) and (c), the activity in question certainly possesses similarities. Accordingly, I believe we should not discard but give substantial weight to the Legislature's finding that such activities are worthy of protection and that, without a clear delineation of the extent of an operator's liability, the survival of such facilities will be greatly jeopardized.
With regard to the less hazardous activity of roller skating, the Legislature made the following findings that I believe have equal or perhaps even greater applicability to skateboarding facilities:
a. The Legislature finds and declares that the recreational sport of roller skating is practiced by a large number of citizens of this State; provides a wholesome and healthy family activity which should be encouraged, and attracts to this State a large number of nonresidents, significantly contributing to the economy of this State. Therefore, the allocation of the risks and costs of roller skating is an important matter of public policy.
b. The Legislature finds and declares that roller skating rink owners face great difficulty in obtaining liability insurance coverage, and that when such insurance coverage is available, drastic increases in the cost of the insurance have taken place and many roller skating rink owners are no longer able to afford it.
This lack of insurance coverage adversely affects not only the roller skating rink owners themselves, but also patrons who may suffer personal injury and property damage as a result of accidents which occur on the premises of the roller skating rink.
In order to make it economically feasible for insurance companies to provide coverage to roller skating rinks, the incidence of liability should be more predictable. That predictability may be *1110 achieved by defining the limits of the liabilities of roller skating rink operators in order to encourage the development and implementation of risk reduction techniques.
[N.J.S.A. 5:14-2.]
Since the Legislature has not enacted similar protections for both patrons and operators of skateboarding facilities, I believe that an entity, such as Vans, may attempt to fairly define the scope of its liability through the execution of an agreement such as that in question here. Because the Legislature has seen fit to protect roller skating rink operators by rendering predictable "the incidence of liability," N.J.S.A. 5:14-2(b), in order to render feasible the providing of liability coverage by insurance companies, I fail to see how it is contrary to public policy for a skateboarding facility operator to secure a similar level of predictability by obtaining pre-tort releases from patrons.

E
I also disagree with the majority's analysis because I believe the decision to permit the pursuit of a tort remedy, which is the upshot of the majority's decision, must be squarely centered upon the understanding that the creation of a tort standard  or, viewed from another legal viewpoint, the rejection of a free and voluntary contract  should have as its consequence the creation of safer premises and products. The imposition of tort liability is useful in society not merely to compensate injured persons but to deter unsafe conduct by those found liable and others similarly situated. In this way, the law has a shadowy, beneficial impact that guides and molds future conduct.
Here, the result of the majority's decision is, in my view, all shadow and no benefit. Preventing Vans from insulating itself from claims for injuries sustained by a skateboarder that result from the inherent risks of the sport cannot possibly prompt Vans to mold its conduct in a beneficial way. The imposition of all the tort liability in the world on an operator of such a facility, for injuries resulting from the sport's inherent risks, will not bring about a beneficial change in its facility. If Andrew merely fell off his skateboard, I fail to see how the imposition of tort liability on Vans would cause Vans to make any beneficial alteration in its premises. Thus, the imposition of tort liability in such an instance would produce no societal benefit. And, if Vans is to be held responsible for injuries resulting from a skateboarder's mere fall from his skateboard, should we either anticipate or welcome a change in the facility that would protect against similar future occurrences? If such facilities felt compelled by the possibility of tort liability to adopt additional safety precautions to prevent such inevitable injuries, will skateboarding eventually take place in a large padded room by participants wrapped in styrofoam and suspended by wires to catch them from hitting the ground upon falling? At that point, if not much sooner, skateboarding ceases to be skateboarding. An overreaching onslaught of tort liability upon such businesses would eventually bring an end to skateboarding and numerous other "extreme sports" as practiced in controlled facilities.
These views, I hasten to add, are not mine alone. The Legislature has already determined that there is a place in society for other inherently hazardous sports, such as skiing, sledding and tobogganing, N.J.S.A. 5:13-1 to -11, roller skating, N.J.S.A. 5:14-1 to -7, and equine animal activities, N.J.S.A. 5:15-1 to -12. Indeed, while the Legislature has not enacted similar legislation regarding skateboarding, it is noteworthy that skateboarding may be *1111 viewed as a combination of roller skating and skiing or sledding, sports our Legislature has determined worthy of its protection through the creation of parameters governing liability and the assumption of risk. Because of its concern that businesses involved in such sports are endangered by ruinous lawsuits and spiraling insurance costs  thus causing an unwarranted detrimental impact on the State's economy[11]  the Legislature has enacted standards of care that preclude claims for injuries to participants, regardless of age,[12] resulting from the inherent risks of skiing, sledding, tobogganing and using other similar vehicles, N.J.S.A. 5:13-5, roller skating, N.J.S.A. 5:14-6,[13] and equestrian sports, N.J.S.A. 5:15-3.
Since it would seem, without knowing more about how this accident occurred, Andrew's claim for damages must fail if it is shown that his injury occurred as a result of a risk he assumed, such as falling off his skateboard, being struck or knocked off his skateboard by another participant, by some defect in his own skateboard, or in failing to heed instructions as to the use of the facility, I see no reason why his parent's promise not to seek damages for the injuries resulting from such inherent risks should not be enforced. Such an agreement, if executed by a parent in conjunction with a child's use of a ski slope or a roller skating rink, would not be void against, but entirely consistent with, public policy. I believe the same approach should be adopted here.
Just as the Roller Skating Act does not immunize operators but merely "afford [s] them more predictable liability exposure," Derricotte v. United Skates of Am., 350 N.J.Super. 227, 235, 794 A.2d 867, 872 (App.Div.2002) (quoting Calhanas, supra, 292 N.J.Super. at 525, 679 A.2d at 191), Vans' pre-tort release purports to do much the same thing. It makes no attempt to insulate Vans from all claims of all types, but instead advises patrons of their right to sue for some claims but not others. Just as the Legislature has erected parameters *1112 for the operation of roller skating rinks that define the operator's obligations and the risks that patrons assume, I find no public policy that would prevent a skateboarding facility from setting reasonable parameters regarding its undertaking through the securing of pre-tort releases.

III
The only question that remains is whether the pre-tort release in question pushes the parameters of what claims may be released and what should be preserved beyond reason.
In this regard, it is important to recognize that the pre-tort release does not attempt to extinguish claims based upon some unfitness or unsafe condition of the equipment supplied by Vans, but only claims that are based upon the inherent risks of the sport that the patron has assumed. Paragraph 3(c) of the document in question suggests that the patron gives up any claim unless injured because "Vans intentionally failed to prevent or correct a hazard caused by unsafe equipment and devices." Certainly, a court should not permit enforcement of a release of intentionally wrongful conduct, and the release so acknowledges. In addition, it is observed that the complaint does not allege any intentional conduct by Vans that gave rise to Andrew's claim.
The question that follows is whether the agreement includes a release of claims based upon Vans' negligent failure "to prevent or correct a hazard caused by unsafe equipment and devices." Because the following paragraph of the agreement indicates that the patron does "not give up the right ... [t]o have safe equipment, structures and devices at the Park for [y]our intended use," or to seek "compensation for [y]our injury ... if you are hurt because the equipment, structure and devices at the Park are not safe for [y]our intended use," I would conclude that the agreement intended to permit a party to seek relief when an injury is proximately caused by some condition or equipment that was rendered or became unsafe as a result of negligent acts or omissions. This approach comports with the principle that an exculpatory agreement, when ambiguous, should be construed against the party relying upon its terms. See Chemical Bank of N.J. v. Bailey, 296 N.J.Super. 515, 528, 687 A.2d 316, 322-23 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997).
The construction of the agreement that appears most logical is that all claims are released unless specifically preserved within the document. That is, the document states that "Vans is asking you to give up legal rights in order to enter this park," followed by the statement that "using Vans' Park, or even entering the Park as a spectator may increase your risk of harm." The only reasonable interpretation of this language is that, by executing the document, the patron has expressly assumed the risks inherent in participating in skateboarding or merely watching others engaging in the sport. As outlined at length earlier in this opinion, I cannot conclude that this express assumption of the risk is invalid or unenforceable either when applied to a claim based upon an adult's or a minor's injuries.
Another potential claim  perhaps that upon which Andrew's claim is based[14]  is when a participant is struck or knocked off *1113 his or her skateboard by another participant. The pre-tort release expresses the patron's agreement to waive a claim if the patron is "injured by another person." Again, because such an occurrence normally falls within the inherent risks of the sport, I would uphold the release to this extent. Accord N.J.S.A. 5:14-6 (roller skaters assume the inherent risk of injury resulting "from incidental contact with other roller skaters or spectators"). However, the agreement also indicates that by executing the agreement, the patron agrees to "abide by the rules of safety/conduct posted in the park" and that the patron understands that "these rules are strictly enforced." I would interpret these provisions to mean that Vans has adopted rules for the use of the park and has voluntarily undertaken the obligation to strictly enforce those rules. Accordingly, a fair construction of these provisions would lead to the conclusion that Vans has not attempted to obtain the release of claims based upon the inadequacies of its posted warnings or claims based upon its negligent failure to strictly enforce those rules. As a result, I do not believe we need to decide whether a pre-tort release could secure the waiver of a claim based upon negligent supervision,[15] because the only reasonable interpretation of the agreement in question reveals that Vans made no attempt to bar such a claim.
In the final analysis, because of the absence of any evidence as to how this incident occurred, it cannot be said whether the pre-tort release governs this claim. For the reasons expressed above, I would apply the pre-tort release to bar any claim based upon a risk inherent in skateboarding, such as Andrew's falling from his skateboard without any impact from another skateboarder or if his fall was not otherwise caused by some defect in the structures or equipment supplied by Vans; I would also apply the pre-tort release to bar Andrew's claim even if he was thrown from his skateboard as the result of a collision with another skateboarder, because that circumstance is also the type of incident that arises from the inherent risk in the sport. However, I would permit the further pursuit of the claim if the collision resulted from a breach of the posted safety rules and from a failure of Vans to strictly enforce those rules  not because I believe that a pre-tort release may not be obtained in this regard  but because the agreement in question does not purport to release such a claim. Lastly, if Andrew claims that his injury was proximately caused by some defect in the structures, equipment or devices provided by Vans, I would permit the further pursuit of this claim because it is not encompassed by this release.
In short, because we do not know, and cannot discern from the record, how this incident occurred, it cannot be said whether Andrew's claim is barred by the pre-tort release. Hence, in my view, the arbitrator should be instructed to first determine how the incident occurred.

IV
For these reasons, I concur in the majority's determination that the agreement in question is binding insofar as it requires that any viable claims be arbitrated and *1114 not resolved in a judicial forum. I also concur in the majority's holding that the trial judge should have ruled on the validity of the pre-tort release and not referred that question to the arbitrator. And lastly, while I disagree with the majority's disdain for a parent's pre-tort release of a child's claims, I agree that in this case the arbitrator must determine how this incident occurred. Other than the analytical differences we have expressed in arriving at this point, the only difference in result lies with my belief that the arbitrator should determine how the incident occurred in order to determine whether the pre-tort release governs this claim, whereas the majority would have the arbitrator determine how the incident occurred in order to determine whether Vans' defense of assumption of the risk bars Andrew's claims. As played out in the arbitration proceedings in this case, the distinction drawn in our separate opinions may have no practical consequence. However, we write not just for the case at hand. There may very well be other future instances, involving the same or similar pre-tort releases, where the consequences of our differing views would not be indistinguishable as ultimately is the case here.
NOTES
[1] The case properly should have been stayed pending completion of the arbitration proceedings. See N.J.S.A. 2A:24-4 (prior Arbitration Act); N.J.S.A. 2A:23B-7(f) and (g) (new Act). See also Ravin, Sarasohn, Cook Baumgarten, Fisch & Rosen, P.C. v. Lowenstein Sandler, P.C., 365 N.J.Super. 241, 247, 839 A.2d 52, 55 (App.Div.2003).
[2] The provisions of N.J.S.A. 2A:24-1 to -11 were superseded by N.J.S.A. 2A:23B-1 to -32, effective January 1, 2003. Andrew's accident occurred four days later. However, N.J.S.A. 2A:23B-31 provides that "an arbitration agreement made before the effective date of this act is governed by N.J.S. 2A:24-1 et seq." The execution of the agreement at issue occurred prior to the new Act's effective date.

We lack sufficient information to determine whether the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16, is applicable to this case. See 9 U.S.C.A. § 1.
[3] We reject plaintiffs' argument that the choice of an arbitration forum will subject them to additional and unaffordable litigation expenses. Those expenses (including any expense incident to an increase in the limit of recovery) must be paid by Vans under the terms of the contract at issue, and it acknowledges that obligation.
[4] This entire volume is devoted to issues that relate to mandatory arbitration.
[5] We thus do not employ the rules of contract interpretation expressed in such cases as McBride v. Minstar, Inc., 283 N.J.Super. 471, 486, 662 A.2d 592, 600-01 (Law Div.1994), aff'd sub nom, McBride v. Raichle Molitor, U.S.A., 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995).
[6] In this context, see Fitzgerald v. Newark Morning Ledger Co., 111 N.J.Super. 104, 107-08, 267 A.2d 557, 558-59 (Law Div.1970) (invalidating a pre-tort parental release and indemnification agreement that required the parent to save the Ledger harmless from all claims by the son, holding that it created a disincentive to the institution of an action by the parent on the child's behalf).
[7] There is no claim in this case to the protections of this Act, which appears inapplicable as the result of its definitional section.
[8] Although the release in this case is not clear, it appears to release Vans from actions based upon the negligence of it and its employees.
[1] The document unambiguously cautioned Anastasia in the following plain English: "Do not sign this document unless you understand it."
[2] The release in McCarthy was not enforced because NASCAR had attempted, by obtaining the release, to avoid its statutorily-imposed duty of care. The Court, however, held that, absent NASCAR's overreaching, such agreements involve private matters and are "undoubtedly valid and enforceable." 48 N.J. at 543, 226 A.2d at 715. In this regard, it is noteworthy that the Court distinguished the out-of-state decisions that enforced releases signed by stock car drivers because "in those states," unlike New Jersey, "there were no statutes or regulations evidencing public policy or official interest in this field of activity." Id. at 542, 226 A.2d at 714. Since there are no "statutes or regulations" governing skateboarding facilities in this State, McCarthy would permit the enforcement of Vans' pre-tort release.
[3] While unnecessary to our decision, see Section III, below, and until statutory standards of care are imposed, I would also conclude, for these same reasons, that a parent may waive claims based upon the negligence of skateboarding facility operators.
[4] The majority relies upon, among others: Cooper v. Aspen Skiing Co., 48 P.3d 1229 (Colo.2002); Shea v. Global Travel Mktg., Inc., 870 So.2d 20 (Fla.App.2003), review granted, 873 So.2d 1223 (Fla.Sup.Ct.2004); Meyer v. Naperville Manner, Inc., 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411 (1994); Munoz v. II Jaz Inc., 863 S.W.2d 207 (Tex.App.1993); Hawkins v. Peart, 37 P.3d 1062 (Utah 2001); Scott v. Pacific West Mtn. Resort, 119 Wash.2d 484, 834 P.2d 6 (1992).
[5] In Zukerman, a parent, who was also an injured child's guardian ad litem, refused to accept "a lifetime of guaranteed payments for his son with a substantial up front [payment] to take into account his present needs or the present needs of the family on a sheer gamble that a jury would return a verdict substantial in nature which might never be collected, which might be reversed, both after the liability trial or after the trial on damages," and where there were also insurance coverage problems. 232 N.J.Super. at 85, 556 A.2d at 780. The trial judge, obviously concerned by the guardian's "wish[ ] to gamble against an unknown pot with unknown coverage with unknown quantity of legal problems and appeals," ibid., 556 A.2d at 781, removed the parent as the child's guardian. We reversed, concluding that the trial judge could not remove a guardian ad litem in the absence of "clear and convincing evidence of misconduct or inability to serve the best interests of the ward," or the guardian's own incapacity, which "may include conflict of interests which would prevent any reasonably prudent person, including a parent, from continuing to serve as a guardian ad litem." Id. at 95, 556 A.2d at 786. We there held that a "difference of opinion ... as to whether or not a proposed settlement offer was sufficient, or should be accepted because of the inherent risks of a trial on liability or damages, or both, is neither misconduct nor such conflict of interest as would warrant the court's interference." Id. at 95-96, 556 A.2d at 786. Instead, we deemed it "inappropriate for any court to presume that it knows better than the parents what is in the best interests of [their] child," id. at 98, 556 A.2d at 787, and that, under such circumstances, the guardian ad litem "must of necessity have the sole right to accept or reject a settlement offer," id. at 99, 556 A.2d at 787.
[6] I would respectfully observe, however, the incongruity in my colleagues' prioritization of the competing public policies they have recognized. In invalidating the release provisions of the agreement, the majority trumpets "the principle that the judiciary must stand as guardians of the State's children," yet in upholding the arbitration and waiver of trial by jury provisions, the majority apparently finds the policy in favor of arbitration more important than the best interests of the State's children.
[7] See Nelson, supra, 36 U.S.F. L. Rev. at 555; Scott, supra, 834 P.2d at 12 ("[I]nvalidation of releases signed by parents to bar children's claims would make sports engaged in by minors prohibitively expensive due to insurance costs.").
[8] It was recently observed that 85% of all skateboarders are under the age of eighteen. See David Horton, Extreme Sports and Assumption of Risk: A Blueprint, 38 U.S.F. L. Rev. 599, 618 n. 104 (2004).
[9] The majority is dismissive of this "parade of horribles," asserting that there is a lack of evidence comparing the incidence, circumstance or severity of injuries sustained in skateboarding facilities and those sustained elsewhere to justify concerns about the public need for and worth of skateboarding facilities. I would have thought it self-evident that skateboarding would be safer in a contained environment, and that the type of serious or fatal injuries referred to, by way of example, in this "parade of horribles" is unlikely to occur in skateboarding facilities where motor vehicle traffic is presumably forbidden.
[10] See King, supra, 53 Ohio St. L.J. at 739 ("The threat of liability might induce ladder manufacturers, for example, to stop manufacturing ladders. This in turn may force people to use the more dangerous kitchen chair instead of a ladder when they replace a bulb.").
[11] In considering the economic impact of our judgment on the future operation of skateboarding facilities in this State, we should not be unmindful of the extraordinary popularity of skateboarding  a sport that appears to be outgaining most other sports in popularity among American teenagers. For example, it has been reported that skateboarding is the fastest growing sport in the United States. Horton, supra, 38 U.S.F. L. Rev. at 602 n. 21. Teenagers have recently rated skateboarder Tony Hawk as the most popular male athlete, ahead of Shaquille O'Neil, Tiger Woods, Derek Jeter and Michael Jordan. Id. at 602 n. 22. In 2002, sporting goods stores sold more skateboards than baseball gloves. Id. at 603 n. 23.
[12] For example, N.J.S.A. 5:13-9 indicates that the time for reporting an incident and the time for filing suit are tolled, when the ski or sled "accident or incident" involves a minor, until the minor turns eighteen. It can be inferred from this that the other provisions of the statutes governing skiing, sledding and tobogganing apply to minors unabated. See also N.J.S.A. 5:15-8 (which similarly tolls time provisions regarding minor's claims for injuries from equine sports). While a similar provision is not contained in the Roller Skating Act, I would assume that this is not because the Roller Skating Act does not apply to minor roller skaters but because there are no reporting requirements in the Act.
[13] "Roller skaters and spectators are deemed to have knowledge of and to assume the inherent risks of roller skating, insofar as those risks are obvious and necessary. These risks include, but are not limited to, injuries which result from incidental contact with other roller skaters or spectators, injuries which result from falls caused by loss of balance, and injuries which involve objects or artificial structures properly within the intended path of travel of the roller skater, which are not otherwise attributable to a rink operator's breach of his duties as set forth in [N.J.S.A. 5:14-4]." N.J.S.A. 5:14-6. See also N.J.S.A. 5:14-5.
[14] The complaint alleges that Vans "did negligently fail to supervise the activities at the skate park, negligently failed to control activities of aggressive skateboarders, negligently failed to warn Plaintiff's parents that the activities of aggressive skateboarders would not be monitored, and negligently failed to provide a safe place to skateboard." This is the only "evidence" in the record that would suggest how this incident may have occurred.
[15] Absent a statutorily-imposed standard of care  and, as observed earlier, our Legislature has not imposed any standards in this industry  I believe a skateboarding facility operator could obtain a valid and enforceable release of such claims. See Restatement 2d, Torts § 496B (1965). It is only when the purveyor of such a sporting activity attempts to absolve itself from a statutorily-imposed standard of conduct that such agreements will be invalidated by our courts for "public policy" reasons. Accord McCarthy, supra, 48 N.J. at 542-43, 226 A.2d at 714-15. That is because the public policy to be vindicated is the standard of care created by the Legislature.