292 N.J. Super. 513 (1996)
679 A.2d 185
MANUEL CALHANAS AND DINA CALHANAS, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
SOUTH AMBOY ROLLER RINK, D/B/A ROLLER MAGIC, JOHN DOE (A FICTITIOUS NAME), PETER POE (A FICTITIOUS NAME), AND ABC CORP. (A FICTITIOUS NAME), DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 5, 1996.
Decided July 24, 1996.
*516 Before Judges KING, LANDAU and HUMPHREYS.
Kenneth W. Elwood argued the cause for appellants (Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, attorneys; Mr. Elwood, on the brief).
Nicholas A. Giuditta, III, argued the cause for respondents (Mr. Giuditta, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case involves the "New Jersey Roller Skating Rink Safety and Fair Liability Act," N.J.S.A. 5:14-1 to -7; L. 1991, c. 28, effective February 19, 1991. The injured plaintiff Manuel Calhanas, and his wife, Dina Calhanas, who brought a derivative action, appeal from a summary judgment in favor of South Amboy Roller Rink (Roller Magic). Manuel Calhanas claimed that he was seriously injured while skating at defendant's rink on January 19, 1992. We conclude that Roller Magic's motion for summary judgment was improperly granted. We reverse. See Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 539-40, 666 A.2d 146 (1995). The evidence available to the motion judge was not so "one-sided" that defendant was entitled to prevail as a matter of law. Id. at 540, 666 A.2d 146.

I.
Plaintiff, Manuel Calhanas, age 37 and a Kearny resident, had roller-skated at defendant Roller Magic's rink in South Amboy about 20 times over the past decade. On the afternoon of January *517 19, 1992 Calhanas and his family arrived at Roller Magic's rink at 2 p.m.
Plaintiff was injured at 4:30 p.m. during a "couples' skate." He was skating with his young daughter at the time. Plaintiff testified on deposition "there was a small kid going, crossing the rink, going a little wild, skating by himself." Plaintiff said that "as I was riding with my daughter, the kid comes from the left side, cutting across towards the center of the rink and hit me on my left-hand side. I lost my balance and fell and that's when I broke my leg ... in two places." Plaintiff testified that before the accident the rink had announced the slower-paced couples' session and he invited his daughter to skate with him. As plaintiff skated two or three times around the rink during this couples' session, he observed the young skater: "He was just going by himself, crossing, you know, in front of people." Dina Calhanas first noticed the child skating erratically during the prior "all skate" session. Manuel Calhanas also observed the child skating improperly during the prior all-skate session  "he was going fast and he kept crossing in front of people"  "I mean he keep, you know, zig zagging, riding in front of people ..."  "he was going too fast for what he was supposed to go"  "he was going faster than anybody else."
According to Roller Magic's representative, there were ten floor guards on duty at the time of the accident  four or five actually skating on the rink. No floor guards' testimony or affidavits were offered in opposition to the motion for summary judgment. Roller Magic's accident report, abstracted from the rink manager's handwritten notes, recorded plaintiff's account  "child cut in front of him and he fell forward." The child was never identified. Plaintiff suffered a severe fracture of the left tibia and fibula.
Plaintiff filed suit on August 18, 1993, claiming his injuries were caused by Roller Magic's negligence in failing to provide adequate rink supervision and to enforce its own safety rules. Posted rink rules caution customers: NO FAST SKATING; NO CUTTING ACROSS FLOOR; NO WEAVING IN AND OUT, and NO *518 SKATING AGAINST THE CROWD. Plaintiff asserted that the floor guard's duty is to enforce these and other rules. Under defendant's rules, a floor guard had the authority to discipline a skater by ordering the skater to sit in the ten-minute "TIME OUT AREA" or to exclude the skater from the rink.
On October 27, 1995 Roller Magic moved for summary judgment, relying on the Skating Rink Safety and Fair Liability Act, N.J.S.A. 5:14-1 to -7 (Act). The deposition testimony of the plaintiffs was the only factual account of the events leading up to the collision. Roller Magic offered no factual version of the events but urged that its records implied adequate rink supervision at the time. Recognizing that this was a "very close case," the Law Division judge granted the motion for summary judgment.

II.
The legislative history of the Act suggested that between 1981 and 1991 the number of roller skating rinks in New Jersey dropped from 50 to 21. That fall-off paralleled a nationwide drop in the number of rinks listed by the Roller Skating Rink Operators of America, from 2,400 in 1975 to 1,150 in 1991. In this context, and at the industry's urging, the Legislature passed and Governor Florio signed the Act effective February 19, 1991. The Legislature expressed concern that rink owners were having difficulty obtaining liability insurance and that the coverage they did obtain was often prohibitively expensive. N.J.S.A. 5:14-2b. This motivated the Legislature, which viewed roller skating as "a wholesome and healthy family activity" which attracts "a large number of nonresidents" to the State and contributes significantly to our economy, to act. N.J.S.A. 5:14-2a. The Legislature expressed the intent that the Act would make it easier for rinks to obtain insurance by making the incidence of liability more predictable. N.J.S.A. 5:14-2b. Seven other states have enacted statutes *519 defining and limiting the liability of roller rink operators since 1989.[1]
The Act, specifically N.J.S.A. 5:14-6, confirms that skaters have knowledge of and assume "the inherent risks of roller skating, insofar as those risks are obvious and necessary." This section provides that skating's inherent risks "include, but are not limited to, injuries which result from incidental contact with other roller skaters ... which are not otherwise attributable to a rink operator's breach of his duties as set forth in [N.J.S.A. 5:14-4]." N.J.S.A. 5:14-6. N.J.S.A. 5:14-7 provides, in pertinent part,
The assumption of risk set forth in [N.J.S.A. 5:14-6] shall be a complete bar of suit and shall serve as a complete defense to a suit against an operator by a roller skater ... for injuries resulting from the assumed risks, notwithstanding the provisions of [N.J.S.A. 2A:15-5.1 et seq.] relating to comparative negligence, unless an operator has violated his duties or responsibilities under this act, in which case the provisions of [the comparative-negligence statutes] shall apply. [N.J.S.A. 5:14-7; emphasis added.]
N.J.S.A. 5:14-7 also provides, "Failure [of skaters] to adhere to the duties set out in [N.J.S.A. 5:14-5 and -6] shall bar suit against an operator to compensate for injuries resulting from roller skating activities, where such failure is found to be a contributory factor in the resulting injury, unless the operator has violated his duties or responsibilities under the act, in which case the provisions of [the comparative-negligence statutes] shall apply." *520 N.J.S.A. 5:14-7. Roller Magic has not alleged that Calhanas failed to adhere to any of his duties as a skater under N.J.S.A. 5:14-5 and -6. Thus, there was no question of plaintiff's comparative negligence raised on the summary judgment motion. As we construe the Act, summary judgment for Roller Magic was appropriate only if Calhanas' injury was caused by "incidental contact" and if it was not attributable to breach of any of Roller Magic's duties.

III.
In granting summary judgment for Roller Magic the judge had to find that Calhanas' injuries were caused by "incidental contact" with the child. On the facts of this case, that determination was for the jury, not for the judge.
The Act does not define "incidental contact." Because the structure of the Act and the sponsors' statements demonstrate that the Act was expressly "modeled" on the "Act Defining the Responsibilities and Liabilities of Ski Area Operators and Skiers" (Skiing Act), L. 1979, c. 29, §§ 1-11, effective February 22, 1979, any definition of "incidental contact" in the Skiing Act could be an appropriate source of guidance. But the Skiing Act's assumption-of-risk provision does not use the term "incidental contact." See N.J.S.A. 5:13-5. Of the seven other states which have roller-rink liability statutes in force, Illinois and Indiana do use the term "incidental contact." Ind. Code § 43-4-43-6(b)(1); Ill. Ann. Stat. ch. 745, para. 72/25. Like our statute, the Indiana and Illinois statutes do not define the term. There are no reported cases in either jurisdiction suggesting what type of contact so qualifies. The few New Jersey cases employing the term "incidental contact" beyond the skiing and roller-skating contexts are not helpful; they use the term only in passing, without defining it. See, e.g., Henry v. Haussling, 114 N.J.L. 222, 225, 176 A. 564 (Sup.Ct. 1935); Slingerland v. Gillespie, 67 N.J.L. 385, 394, 51 A. 475 (Sup.Ct. 1902). Three such cases use "incidental" to mean "fortuitous" or "not significant." See Stehney v. Perry, 907 F. Supp. 806, 823 *521 (D.N.J. 1995) (only incidental contact involved in attaching polygraph equipment to person); State v. D.R., 109 N.J. 348, 353, 537 A.2d 667 (1988) (incidental contact contrasted with sexual contact); B.C. v. Cumberland Reg. Sch. Dist. Bd. Ed., 220 N.J. Super. 214, 229, 531 A.2d 1059 (App.Div. 1987) (although field hockey may involve incidental contact, it is not a contact sport).
For purposes of this Act, however, the better reading of "incidental" is probably the one advanced by Roller Magic: "likely to happen or naturally appertaining." The purpose of the statutory scheme suggests that this is the proper way to understand the term. The Act speaks of skaters having knowledge of and assuming "the inherent risks of roller skating, insofar as those risks are obvious and necessary." N.J.S.A. 5:14-6 (emphasis added). Likewise, the Act's model, the Skiing Act, deems skiers to have knowledge of and assume "the inherent risks of skiing...." N.J.S.A. 5:13-5 (emphasis added). We believe that a similar standard was enunciated in Crawn v. Campo, 136 N.J. 494, 508, 643 A.2d 600 (1994), involving a collision at home plate in a "pickup softball" game. The Supreme Court adopted a standard "leaving free from the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be `part of the game'." Ibid. Summary judgment for Roller Magic was appropriate only if the child's collision with the plaintiff was, as a matter of law, an inherent, obvious risk of roller skating.
On the facts of this case available to us, we cannot say as a matter of law that the collision was an inherent and necessary risk of skating. This does not mean that a motion judge has no role in deciding the "incidental contact" issue. There may be cases where the evidence so clearly shows the injury-producing risk was a normal incident of skating that the issue may be resolved against plaintiff as a matter of law. See Berman v. Radnor Rolls, Inc., 374 Pa.Super. 118, 140, 542 A.2d 525, 535-36 (1988); Smollett v. Skayting Development Corp., 793 F.2d 547 (3d Cir.1986). It might be appropriate for the judge to conclude as a matter of law *522 that the contact was incidental to skating if, for example, the proofs clearly showed that the child was skating in safe and unremarkable fashion and simply lost control and struck the plaintiff.
The present case is apparently not such a situation. Here, Manuel and Dina Calhanas testified that the child who collided with Manuel Calhanas had been skating in an obviously reckless manner for some minutes before the collision. They both testified that the child was skating at a high rate of speed with no one accompanying him, weaving in front of people and cutting across the rink, rather than proceeding around the rink in a circular fashion as he should have. With such testimony, "the jury could reasonably conclude that the risk that produced the injury was a normal incident [of roller skating] or was not." Berman, supra, 374 Pa.Super. at 140, 542 A.2d at 535 n. 2. See, e.g., finding injury-producing risk was not inherent risk or incident of activity, Pietruska v. Craigmeur Ski Area, 259 N.J. Super. 532, 537, 614 A.2d 639 (1992) (improper operation of ski lift not inherent risk of skiing; could have been eliminated through due care); Nierman v. Casino Arena Attractions, 46 N.J. Super. 566, 572, 135 A.2d 210 (App.Div. 1957) (badly deteriorated ice surface not inherent danger of ice skating); Berman, supra, 374 Pa.Super. at 140-41, 542 A.2d 525 (60-foot-wide opening in railing and six-inch drop-off to lower level not normal incidents of roller skating); Roll `R' Way Rinks v. Smith, 218 Va. 321, 237 S.E.2d 157 (1977) (skater fell while attempting to cross steel transition ramp from rink to carpet; defective ramp not inherent risk of skating); Johnson v. Amphitheatre Corp., 206 Minn. 282, 288 N.W. 386 (1939) (skater struck by boys skating in lobby; accident not due to inherent risk of skating but rather to operator's negligent supervision of premises); Johnson v. County Arena, supra, 29 Md. App. at 680, 349 A.2d at 646 (skater did not assume risk of being struck from behind by rink guard playing "tag"). "In such a case," where the evidence permits a reasonable jury to decide either way, "the issue [whether a risk was inherent incident of skating] is for the jury pursuant to an adequate charge on the legal standard that will *523 guide its discretion." Berman, supra, 374 Pa.Super. at 140, 542 A.2d at 535. See also Shorten v. City of White Plains, ___ A.D.2d ___, ___-___, 637 N.Y.S.2d 791, 791-92 (App.Div. 1996) (defendant failed to establish freedom from liability as matter of law in light of plaintiff's evidence that injury was caused not by sudden collision common to the sport but rather by the reckless actions of another skater which defendant could have prevented through adequate supervision). Cf. Johnson v. County Arena, Inc., 29 Md. App. 674, 682, 349 A.2d 643, 647 (Ct.Spec. 1976) (when there is a dispute over whether injured party assumed the risk, question is usually left to the jury).
On the facts in the case before us, the Law Division judge's proper role was to ascertain whether there was sufficient evidence to enable a jury reasonably to decide that the collision with the child was not a normal incident of skating. We conclude the evidence here was sufficient to enable the jury to do so.

IV.
Summary judgment was also improper because there existed a genuine issue as to what actually caused or contributed to the collision between plaintiff and the child. Even assuming that the contact between plaintiff and the youngster could be considered "incidental" to roller skating, Calhanas is not automatically deemed to have assumed the risk of that contact. Under the Act, skaters are not deemed to assume the risk of all incidental contact. Rather, a skater assumes the risk of incidental contact with other skaters[2]if and only if the incidental contact was "not *524 otherwise attributable to a rink operator's breach of his duties as set forth in" N.J.S.A. 5:14-4. N.J.S.A. 5:14-6.[3] Here, plaintiff contends that the collision was attributable to Roller Magic's breach of a duty set forth in N.J.S.A. 5:14-4: its failure to provide adequate supervision by floor guards. The statute requires that "when the rink is open for sessions, [the operator] have at least one floor guard on duty for every approximately 200 skaters." N.J.S.A. 5:14-4(c).
Throughout its brief, Roller Magic repeatedly emphasizes that at the time of Calhanas' collision it had stationed the statutorily-required number of guards on and about the rink. Roller Magic apparently adopts the notion that its statutory duty to provide floor guards is just that  a duty to provide the requisite number of guards  and nothing more. Under such a construction, even if the guards were negligent in not noticing and stopping the youngster's reckless skating, that negligence was not a breach of the duty imposed by N.J.S.A. 5:14-4c. Since such a collision could not be "attributable to" Roller Magic's breach of a duty under N.J.S.A. 5:14-4, Calhanas would be deemed to have assumed the risk and be barred from suit. N.J.S.A. 5:14-6, N.J.S.A. 5:14-7. This line of reasoning is quite unpersuasive. Considering the duty to post floor guards satisfied by the fact of *525 posting alone is an unduly narrow, mechanical reading of N.J.S.A. 5:14-4c. Taking that reading to its logical extreme, an operator could satisfy his statutory duty to post guards by setting out guards who are inattentive, or even asleep, while patrons skate recklessly.
Necessarily implicit in the duty to post floor guards is a duty to post adequately trained guards who take due care to render competent and watchful supervision. Several states spell this out expressly. Ohio, for instance, requires that floor supervisors have "received the training appropriate for such duties" and shall "comply with the duties of a floor supervisor as defined by the [operators association], including directing traffic and assisting roller skaters who may fall or sustain injuries." Ohio Rev. Code Ann. § 4171.07. The statute further clarifies that floor supervisors also shall issue warnings, reprimands, or penalties to roller skaters who violate the responsibilities set forth earlier in that statute. Ibid. Indiana similarly requires appropriately trained floor supervisors who "use reasonable care in carrying out" their duties. Ind. Code § 34-4-43-4(3). See also Tex. Health & Safety title 9, § 759.002(2) (Vernon's) (operator has duty to require floor guards to "direct and supervise skaters and spectators" and "watch for foreign objects that may have fallen on the floor"). Although our statute does not "flesh-out" what the required floor guards must do once posted, our statute clearly must be construed to require trained, reasonably-alert guards. Reading the Act otherwise would effectively immunize an operator from liability for injuries resulting from guard negligence once it has placed any guards on the floor. That would be a "result not in accord with the essential purpose and design of the act," New Jersey Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338, 288 A.2d 855, (1972); State v. Tekel, 281 N.J. Super. 502, 506, 658 A.2d 1281 (App.Div. 1995). The purpose of the Act was not to immunize operators but to afford them more predictable liability exposure by fairly allocating risks and responsibilities among skaters and operators. See Walcott v. City of Plainfield, 282 N.J. Super. 121, *526 127, 659 A.2d 532, 535 (App.Div. 1995) (courts should construe legislation to avoid absurd, anomalous or unreasonable result).
Roller Magic's satisfaction of its statutory responsibility to deploy at least the prescribed ratio of floor guards to skaters does not necessarily establish that plaintiff's accident was unattributable to breach of a duty. This proposition would follow only upon the untenable premise that rink operators have no implicit duties arising out of the obligations specifically enumerated in N.J.S.A. 5:14-4. We have expressly rejected this contention in the cognate context of an injured skier's tort claim under the Skiing Act. In Reisman v. Great American Recreation, 266 N.J. Super. 87, 628 A.2d 801 (App.Div. 1993), plaintiff was a novice skier proceeding slowly and cautiously down a beginner's slope when a drunken skier, whose condition was known to the operator's employees, crashed into and injured him. Id. at 89, 628 A.2d 801. "In such circumstances, general negligence principles concerning the duty owed by owners and occupiers of land to business invitees would be the appropriate standard." Id. at 97, 628 A.2d 801. See also Brett v. Great American Recreation, Inc., 144 N.J. 479, 501-03, 677 A.2d 705, 716-17 (1996) ("The analysis under the Ski Statute and the analysis under the common law of negligence have significant parallels.")
We recognize that the roller skating Act is modeled on the Ski Statute. In Brett, supra, 144 N.J. at 501-02, 677 A.2d 705, the Supreme Court said: "The statutory standard [in the Ski Statute] does not necessarily mirror the common law" and that "[i]n some respects the balance has been shifted in favor of operators." The Supreme Court also said: "that where the Ski Statute properly applies, the Legislature intended completely to displace the common law with regard to the statutorily defined parties." Ibid. Nonetheless, we find no legislative intention in the roller skating Act to absolve the rolling skating rink operator from its common law duty of reasonable care in the carrying out of its express statutory duties.
*527 Moreover, the roller-skating Act's Sponsors' Statement[4] clearly demonstrates that the operator's responsibilities was not to end with those precisely enumerated in the Act. The Statement explains that the operator's "responsibilities ... include complying with all roller skating rink safety standards published by the Roller Skating Rink Operators Association," even though this duty does not appear in the Act.[5] Although the Act does not expressly *528 so state, both common sense and the Reisman Skiing Act precedent make intuitively clear what Georgia has spelled out in its statute: "Nothing in this [Act] shall be construed to relieve an operator from exercising ordinary diligence in his or her operational responsibility." Ga. Code Ann. § 51-1-43(g).
A jury could reasonably conclude, from plaintiff Calhanas' presently-uncontradicted account, that Roller Magic was less than ordinarily diligent in supervising the rink and that this lack of diligence proximately contributed to the young skater's collision with him. Cf. Crammer v. Willston Operating Co., 19 N.J. Super. 489, 490-91, 88 A.2d 630 (App.Div. 1952) (plaintiffs knocked down and injured when man skated between them; earlier floor guards had to slow down group of young men bordering on rowdyism; evidence justified inference that guards should have been more alert and that better policing of rink would have deterred dangerous skating).
We reverse the order granting summary judgment to defendant Roller Magic and remand. On remand, Calhanas and Roller Magic should have the opportunity to argue to the jury on whether the contact between Calhanas and the child was incidental to the sport of roller skating and whether that contact was attributable to Roller Magic's breach of its duty to exercise due care to supervise the rink under the Act and our common law.
Reversed.
NOTES
[1] These seven states are Texas, Illinois, Ohio, Michigan, Indiana, Georgia and Maine. Michigan was the first, enacting the "Roller Skating Safety Act of 1988," Mich. Comp. Laws Ann. Ch. 445, §§ 1721-11726, P.A. 1988, No. 389, secs. 1-6, eff. March 30, 1989 (West 1996); followed by Maine's "Roller-Skating Safety Act," Me. Rev. Stat. Ann. tit. 8, §§ 603-608, added by 1991 c. 124, no eff. date listed; Ohio's Chapter on "Roller Skating," Ohio Rev. Code Ann. §§ 4171.01-4171.10 (Baldwin's), added by 1992 sec. 347, eff. April 1, 1993; Indiana's "Limited Liability for Operators of Roller Rinks," Ind. Code §§ 34-4-43-1 to -8, P.L. 241-1993, Secs. 1 & 2, eff. April 30, 1993; Georgia's "Roller Skating Safety Act of 1993," Ga. Code Ann. § 51-1-43, Ga. L. 1993, p. 719, sec. 1, eff. July 1, 1993; and Texas' "Roller-Skating Centers," Health and Safety tit. 9, §§ 759.001-759.005 (Vernon's), added by Acts 1993, 73d Leg., ch. 909, sec. 1, eff. Sept. 1, 1993.

Most recently, on June 23, 1995 the Illinois Legislature approved the "Civil Immunities-Roller Skating Rink Safety Act," Ill. Ann. Stat. ch. 745, para. 72/1 to 72/30 (Smith-Hurd 1996), P.A. 89-37, eff. Jan. 1, 1996.
[2] Plaintiff recalls that the youngster who allegedly collided with him was wearing rollerblades, not standard rollerskates. As a consequence, plaintiff contends, Roller Magic's liability for the collision is not governed by the Act, which speaks of "roller skaters." This is unduly technical and unpersuasive. The Act defines "roller skater" as "a person wearing roller skates while in a roller skating rink for the purpose of recreational or competitive roller skating." N.J.S.A. 5:14-3b. While it might be helpful to add the words "rollerblades or in-line skates" to the definition of "roller skater," cf. N.J.S.A. 5:13-2c's broad definition of "skier," common sense suggests the Legislature did not intend to draw any distinction between the various kinds of roller skates. While it may be unusual to use rollerblades rather than traditional roller skates on an indoor rink, both kinds of skates are suitable for the purpose. (The four wheels are paired on roller skates; the four wheels are "in-line" on roller blades.)
[3] Texas, Illinois, Indiana and Ohio all effectively limit operator liability to injuries caused by breach of statutorily prescribed operator's duties. Michigan and Maine, by contrast, provide that inherent risks are not deemed assumed where the resulting injury is attributable to the operator's breach of its "common law duties." Mich. Comp. Laws Ann. Ch. 445, §§ 1721-5 (emphasis added); Me. Rev. Stat. Ann. tit. 8, § 607 (emphasis added). Georgia accomplishes much the same thing by providing, "Nothing in this Code section shall be construed to relieve an operator from exercising ordinary [common law] diligence in his or her operational responsibility." Ga. Code Ann. § 51-1-43(g).
[4] The Sponsor's Statement provides:

The bill would define the responsibilities and liabilities of roller skating rink operators and roller skaters. The bill is modeled on P.L. 1979, c. 29 (C. 5:13-1 et seq.), which sets out the responsibilities and liabilities of ski area operators and skiers.
The bill provides that a roller skating rink operator would not be liable to a skater for a skating injury unless the operator violates his responsibilities, which include complying with all roller skating rink safety standards published by the Roller Skating Rink Operators Association and posting appropriate signs.
In addition, the bill bars a roller skater from suing a rink operator if the skater contributed to his own injury by violating the skater's responsibilities. Skaters' responsibilities would include: maintaining reasonable control over their speed and course; heeding all posted signs and warnings; maintaining a proper outlook to avoid other roller skaters and objects; accepting responsibility for knowing the range of their skating ability and to skate within the limits of that ability, and refraining from acting in a manner which may cause or contribute to injury.
Roller skaters and spectators would be deemed to have knowledge of and to assume the risks of roller skating, insofar as those risks are obvious and necessary. The risks include injuries which result from collisions with other roller skaters or spectators, injuries which result from falls and injuries which involve objects or artificial structures properly within the intended path of travel of the roller skater.
A roller skater or spectator would not be barred from suing an operator based upon assumed risks or for injuries to which the skater or spectator contributed if the operator violated his duties or responsibilities under the bill. In this case, the provisions of the comparative negligence law would apply.
[5] Four other states' roller-rink liability statutes expressly enumerate the operator's duty to comply with the Association's published safety standards. Mich. Comp. Laws Ann. § 445.1723 (West 1996); Me. Rev. Stat. Ann. tit. 8, § 605-2; Tex. Health & Safety tit. 9, § 759.002(5) (Vernon's); Ill. Ann. Stat. ch. 745, para. 72/15(2) (Smith-Hurd 1996). A fifth state, Georgia, refers to the operator's duty to comply with "the safety standards ordinarily accepted in the ... industry." Ga. Code Ann. § 51-1-43(c)(2). A sixth state, Ohio, does not refer to any general operator duty to follow Association or industry standards, but states that operators must post floor guards who "comply with the duties of a floor supervisor as defined by the roller skating rink operators of America...." Ohio Rev. Code Ann. § 4171.07 (Baldwin's).

Indiana does not expressly list the operator's duty to comply with Association-published safety standards or with industry standards generally. It does refer, however, to "all applicable state and local fire safety codes, building codes, and other safety codes applicable to a roller skating rink." Ind. Code § 34-4-43-4(8) (emphasis added).