2025 IL App (2d) 240137-U
No. 2-24-0137
Order filed March 12, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MARC MEETERS, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-L-492 |
| | ) | |
| WINDMILL CITY ENTERTAINMENT, | ) | |
| INC., d/b/a Funway Family | ) | |
| Entertainment and ROBERT HANSEN, | ) | Honorable |
| | ) | John G. Dalton, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In plaintiff's action against a roller skating rink for injuries incurred during a skating accident, (1) summary judgment for the rink was improper because material fact questions existed as to whether the rink was entitled to immunity under the Roller Skating Rink Safety Act and (2) plaintiff could base his premises liability claim on an allegedly unreasonable risk posed by poor supervision of skaters and need not prove a physical defect in the premises.

¶ 2    Plaintiff, Marc Meeters, appeals from the order granting summary judgment in his personal injury lawsuit against defendants, Windmill City Entertainment, Inc., d/b/a Funway Family Entertainment (Funway), and Robert Hansen, Funway's owner, on the basis that the suit was

barred by the immunity provision of the Roller Skating Rink Safety Act (Skating Act) (745 ILCS 72/1 *et seq.* (West 2018)). Plaintiff contends that summary judgment was improper because questions of material fact exist as to whether immunity applies. He also argues—on an issue raised in defendants' summary judgment motion but not reached by the trial court—that he was not required to allege and prove the existence of a physical defect in the premises to prevail on his claim under the Premises Liability Act (Premises Act) (740 ILCS 130/1 *et seq.* (West 2018)). We reverse and remand because (1) questions of material fact exist as to whether immunity applies under the Skating Act and (2) plaintiff's claim under the Premises Act did not require proof of a physical defect in the premises.

¶ 3                                      I. BACKGROUND

¶ 4      Plaintiff filed a two-count amended complaint against defendants. The amended complaint alleged that defendants owned and operated Funway, a roller skating rink in Batavia. It further alleged that plaintiff, while skating at Funway, injured his knee when another skater bumped into him, causing him to fall. Count I, a negligence claim, alleged that defendants had a duty to provide a safe skating environment and that they breached that duty by, *inter alia*, (1) failing to have a "floor supervisor on duty for every 200 skaters" during skating periods (745 ILCS 72/15(4) (West 2018)) as the Skating Act requires and (2) failing to properly post and maintain signs stating the duties of skaters, spectators, and the operator. Count II alleged that defendants were liable under the Premises Act for knowingly allowing the rink to be in a dangerous condition, such as by failing to have a floor supervisor on duty to ensure skaters complied with the skating rink's safety rules.

¶ 5      Defendants moved for summary judgment. First, as to both counts, defendants asserted that they were immune from suit under the Skating Act because plaintiff's injuries resulted from the inherent risks of roller skating (see 745 ILCS 72/25 (West 2018)) and there was no material

question of fact that defendants did not breach their duties under the Skating Act (745 ILCS 72/30 (West 2018)). Second, as to count II, defendants maintained that they were entitled to summary judgment because plaintiff's premises liability claim required him to prove "an unreasonably dangerous defect on the premises" yet plaintiff "admitted that there was no defect on the surface of the rink that caused him to fall."

¶ 6 In his response to the summary judgment motion, plaintiff argued that immunity under the Skating Act did not apply as a matter of law because there were questions of material fact as to whether defendants had complied with the Skating Act's requirement that there be a "floor supervisor on duty for every 200 skaters" during skating periods (745 ILCS 72/15(4) (West 2018)).[1] Plaintiff further argued that summary judgment was not appropriate as to count II because plaintiff was not required to prove the existence of a physical defect in the premises to maintain a claim under the Premises Act.

¶ 7 The following facts were developed via the various depositions. Plaintiff testified that on the evening of October 25, 2019, he and his wife attended a birthday party at Funway. During the visit, plaintiff skated four times without incident but was injured during his fifth time skating. When he entered the rink for his first skate, he saw "a floor guard or a floor supervisor"[2] in the middle of the rink. The floor supervisor was an adult White male wearing a black-and-white striped shirt and black slacks. He was "giving people directions of the flow of [the]

---

[1]Later, at the hearing on the summary judgment motion, plaintiff clarified that the lack of a floor supervisor "on duty" was the only breach of the Skating Act that plaintiff was arguing for purposes of the motion.

[2]During the litigation, the terms "floor guard" and "floor supervisor" were used interchangeably. "Floor supervisor" is the term used in the Skating Act. See 745 ILCS 72/15(4) (West 2018).

counterclockwise direction to skate in. Others that had stopped in any area, he directed them that they cannot stop or stand, that they have to continue in that counterclockwise [direction]." Plaintiff identified a still shot from a video as showing the skate rental area and, "up above" the rink floor, a disc jockey (DJ) booth. Plaintiff could not recall seeing anyone in the booth during his skating times. When plaintiff was asked if he recalled the floor supervisor taking any corrective action during plaintiff's first four times skating, plaintiff testified that the floor supervisor spotted someone skating against the flow and then immediately corrected the skater. On other occasions, the floor supervisor admonished skaters who were "stopping or standing still."

¶ 8     On his fifth and final time skating, plaintiff entered the rink floor and skated with the designated counterclockwise flow. Shortly after plaintiff entered the rink floor, the floor supervisor "went off duty." Specifically, the floor supervisor left the rink floor and went to the skate rental counter, where he spoke to a female employee. A group of young female skaters entered the rink floor where the floor supervisor had exited. The group stood still when they entered the rink floor. As plaintiff skated, he saw that the floor supervisor had his back to the rink floor while speaking to the employee at the skate rental counter. Plaintiff "[did] not know if [the floor supervisor] was off the clock at that time"; plaintiff "just [knew] that he was not watching the skating rink and not supervising." Plaintiff could not hear what the floor supervisor and the other employee discussed.

¶ 9     As plaintiff approached the group of young female skaters, "[a]t least one of them started to skate backwards and turned around and went in the opposite direction of the traffic flow." A group of skaters in front of plaintiff began to skate around the group of girls. Plaintiff managed to skate past one of the girls who was skating forward against traffic, but when he attempted to skate around the rest of the group, one of them skated backward "directly in front of [his] path." There

was a "slight brush as she went backwards directly in front of [plaintiff]." This contact caused plaintiff to fall. Because of the fall, he suffered a torn anterior cruciate ligament that required surgery. The accident occurred near the entrance/exit to the skate rental area. Plaintiff was unaware of anything on the rink's surface that might have caused his fall.

¶ 10 Robert Hansen (Robert), Funway's president and owner, testified that the role of a floor supervisor was "[s]upervising the roller rink." Floor supervisors were trained per Funway's manual and had to pass a test. DJs were also trained to be and acted as floor supervisors. According to Robert, DJs supervised the skating area from their raised booth. When asked for his definition of "on duty" as it related to floor supervisors, Robert answered, "An employee comes in, punches in, goes over to the roller rink, prepares the skating session, *** begins supervising." When asked if floor supervisors "are *** supposed to be on the floor instructing patrons to follow the rules," Robert answered, "We supervise from the DJ booth. We supervise from off[-]floor. We can supervise—it's an open area. It's not an enclosed area, the roller rink. It's an open area." Robert was then asked, "So what if a group of skaters start skating the wrong way, and the floor guard is facing away from the rink, talking to someone at the rental counter, is that considered on duty?" He answered, "Yes. And the DJ would probably see that, also, and make a comment over the PA system." Robert testified that, according to Funway's schedule for October 25, 2019, Pandora Strandboe was assigned as "guard," and William Lannefeld was assigned as "DJ." Robert reiterated that "DJs are always a guard, also." DJs "wear roller skates," they "jump on and off the floor," and they "supervise from the DJ booth."

¶ 11 Dominic Hansen (Dominic) was Funway's general manager in October 2019. Part of his duties was to supervise the floor supervisors and DJs. In doing so, Dominic occasionally spoke with the floor supervisor during the shift. Dominic was asked if, when speaking to the floor

supervisor, he was "making sure that there's another floor guard or supervisor on the floor watching for the customers." He answered, "Yes. And all floor guards are trained to face the rink floor when they are speaking with me or [a] customer or another staff member." In Dominic's view, a floor supervisor's "primary responsibility [was] supervising the rink floor." According to Dominic, a DJ was a floor supervisor with additional duties; a DJ had "the same responsibility as the floor supervisor or floor guard in regards to supervising the rink floor." A DJ "will move between the DJ booth and the rink floor throughout the session." Dominic explained that "[i]f a guard is going to leave the floor, they would signal to the DJ that they are leaving the floor, and the DJ should make the [*sic*] way to the rink." The DJ would not have to be "physically on the floor" before the floor supervisor left but would need "to have vision on the rink prior to the guard leaving the floor." When asked what he believed it meant for a floor supervisor to be "on duty," Dominic answered, "Responsible for supervising the rink floor on shift." Dominic testified that, although the Skating Act required a floor supervisor for every 200 skaters, Funway's policy was to have a floor supervisor for every 100 skaters. Although Dominic did not read the Skating Act to require that a floor supervisor be "[p]hysically on the floor," he agreed that Funway's policy was to "try to maintain a floor guard on the actual floor at all times." Shown a video taken inside the skating area, Dominic denied that a certain portion of the rink floor was not visible from the DJ booth. Dominic asserted that it would be acceptable for a floor supervisor to step away from the rink floor and talk with an employee in the skate rental area if the floor supervisor was "still able to supervise the rink floor." The floor supervisor was allowed to turn his back to the rink floor only if someone else was "supervising" the rink floor.

¶ 12    Strandboe testified that she worked for several months at Funway in 2019. She worked primarily as a DJ. As part of her DJ duties, she would supervise the rink. According to Strandboe,

there was a "giant window" through which the DJ could see the rink floor. DJs would wear skates the entire time they worked. The roles of DJ and floor supervisor "kind of coincide[ed] with each other." They both wore the same "referee striped shirt."

¶ 13    Strandboe testified that floor supervisors underwent "intense" training. She said a floor supervisor was "absolutely always on the floor." By "floor," she meant "the carpet or the actual skating rink." Sometimes, a floor supervisor would have to assist a skater with getting on or off the rink floor. The "entire time[,] [a floor supervisor was] just making sure all of the rules were being followed and making sure everyone was *** safe and having fun." A floor supervisor was to be "on the floor and *** active and engaging with the skaters." If a skater began skating against the traffic flow, the floor supervisor would blow a whistle and direct the skater to go the other way. According to Strandboe, there was always at least one floor supervisor and one DJ on duty. When asked what she believed it meant for a floor supervisor to be "on duty," she replied, "On the floor, observant, paying attention to everyone that is there, just making sure you're making the regulations sets, making sure the people are listening to you, taking care of anyone that is not doing what they need to, just everything. You're just completely alert all of the time." If a floor supervisor had to leave the rink floor, the DJ would "immediately turn [his or her] attention to the floor." Strandboe testified that there "was just always someone paying attention to the floor." If a floor supervisor needed to use the restroom, they would signal the DJ, who would skate to the rink floor and remain there until the floor supervisor returned.

¶ 14    Shown the schedule for the evening of October 25, 2019, Strandboe identified herself as the assigned floor supervisor and Lannefeld as the assigned DJ. According to Strandboe, she had no recollection of working on the date of the incident.

¶ 15    Lannefeld testified that he worked as a floor supervisor at Funway for several years beginning in 2015. When asked what measures were taken to prevent injuries on the rink floor, Lannefeld answered that one measure was to "keep eyes on the floor at all times." That included monitoring the rink floor, skating over to rule violators, and correcting their behavior.

¶ 16    According to Lannefeld, a floor supervisor who needed to leave the rink floor would whistle to the DJ, who would come onto the floor while the floor supervisor was away. In Lannefeld's opinion, "[o]n duty" for a floor supervisor meant being "present and actively monitoring the floor—or actively monitoring the rink." He added: "They do not have to be on the floor in order to be monitoring, but there should be at least one person. On duty means they are present within the rink area and they are, at the very least, able to monitor the skating floor." After viewing a video taken from the DJ booth, Lannefeld admitted that the video showed a "blind spot" in the DJ's view of the rink floor, caused by the wall surrounding the rink floor: the DJ was unable to see anything that was immediately below the booth and up against the inside of the wall. Lannefeld was not asked if he had any recollection of plaintiff's incident.

¶ 17    At the hearing on the motion for summary judgment, plaintiff clarified that the lack of a floor supervisor "on duty" (745 ILCS 72/15(4) (West 2018)) was the only breach of the Skating Act that plaintiff was arguing for purposes of the motion. Both sides agreed that "on duty" was not defined in section 15(4) or elsewhere in the Skating Act. The trial court, relying on *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033 (2000), found no question of material fact that, at the time of the accident, defendants had complied with section 15(4)'s requirement to have a floor supervisor "on duty." The court reasoned:

> "[The Skating Act] doesn't establish what standards or qualifications are required to be a floor supervisor. And it does—doesn't set forth their duties.

*** 

Here[,] the evidence shows that there was at least one floor supervisor on duty at the time of the plaintiff's injuries. Plaintiff's own testimony is that there was a male Caucasian floor guard that they assert was—had turned his back to the rink at the time of the accident and was asserted to be flirting with the counter worker at that time.

The statute doesn't make a momentary active inattentiveness [*sic*]. It doesn't create liability under those facts. It says that they're entitled to protection if they do everything in the statute. And the only thing that's at issue in this case is whether they had a floor supervisor on duty.

The Court finds that they did. I'm going to rely on the [*Tomczak*] case. *** In part in making that determination, if you read the plain language of the statute, I don't think the statute is ambiguous. So I don't think there's any need to go to the legislative history.

If the Court were to consider the legislative history, the Senate demonstrated they were aware that they were setting a relatively low standard. One of the senators—Both parties quote this language. One of the senators specifically objected that the standards weren't protective enough and used the scenario involving a drunken patron to make their point. The legislature engaged in a balancing to achieve their legislative purposes. It is their role to do that, not mine. And so I am going to grant the motion for summary judgment under the [Skating Act]. That will be the decision. I think that that finding applies to both [counts I and II]."

The court found that summary judgment for Robert was appropriate for the additional reason that he was named only because of his ownership interest in Funway and, as a corporate officer of Funway, he was not personally liable. Also, having found that immunity under the Skating Act

applied to both counts, the court did not reach defendants' alternative argument that summary judgment was proper as to the premises liability claim in count II because there was no evidence of a physical defect in the premises. Plaintiff, in turn, filed this timely appeal.

¶ 18                                              II. ANALYSIS

¶ 19     On appeal, plaintiff contends that (1) summary judgment was improper because there are questions of material fact as to whether defendants had a floor supervisor "on duty" within the meaning of section 15(4) of the Skating Act (745 ILCS 72/15(4) (West 2018)) when the accident occurred and (2) summary judgment on count II could not be upheld on the alternative ground that liability under the Premises Act (740 ILCS 130/1 *et seq.* (West 2018)) must be based on a physical defect in the premises; rather, plaintiff properly based count II on defendants' failure to provide proper supervision of skating patrons.

¶ 20     Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Habdab, LLC v. County of Lake*, 2024 IL 130323, ¶ 18. Our standard of review is *de novo*. *Habdab, LLC*, 2024 IL 130323, ¶ 18.

¶ 21                           A. Immunity Under the Skating Act

¶ 22     We begin our analysis with the relevant provisions of the Skating Act. Section 5 states the purpose of the statute:

> "The General Assembly finds and declares that the recreational sport of roller skating is practiced by a large number of citizens of this State; roller skating is a wholesome and healthy family activity that should be encouraged; and the allocation of risks and costs of roller skating is an important matter of public policy.

The General Assembly further finds and declares that the owners of roller skating rinks face great difficulty in obtaining liability insurance coverage at an affordable cost and that the lack of affordable insurance coverage affects not only owners of roller skating rinks, but also patrons who may suffer personal injury or property damage as a result of accidents that occur on the premises of a roller skating rink. In order to make it more economically feasible for insurance companies to provide coverage to roller skating rinks at an affordable rate to the owners, occurrences resulting in liability to the owners should be more predictable by limiting the liability that may be incurred by the owners and encouraging the development and implementation of risk reduction techniques. This Act should be liberally construed to best carry out the purposes of this Act." 745 ILCS 72/5 (West 2018).

¶ 23 Section 15 sets forth the responsibilities of skating rink operators:

"It is the responsibility of the operator to the extent practicable to:

(1) Post the duties of roller skaters and spectators and the duties and obligations of the operator as prescribed in this Act in conspicuous places in at least 3 locations in the roller skating rink.

(2) Comply with all roller skating rink safety standards published by the Roller Skating Rink Operators Association, including but not limited to the proper maintenance of roller skating equipment and roller skating surfaces.

(3) Maintain the stability and legibility of all signs, symbols, and posted notices required by this Act.

(4) When the rink is open for sessions, have at least one floor supervisor on duty for every 200 skaters.

(5) Maintain the skating surface in a reasonably safe condition and clean and inspect the skating surface before each session.

(6) Maintain in good condition the railings, kickboards, and walls surrounding the skating surface.

(7) In rinks with step-up or step-down skating surfaces, ensure that the covering on the riser is securely fastened.

(8) Install fire extinguishers and inspect fire extinguishers at recommended intervals.

(9) Inspect emergency lighting units periodically to insure the lights are in proper order.

(10) Keep exit lights and lights in service areas on when skating surface lights are turned off during special numbers.

(11) Check rental skates on a regular basis to insure the skates are in good mechanical condition.

(12) Comply with all applicable State and local safety codes." 745 ILCS 72/15 (West 2018).

In this appeal, the only relevant requirement is to "have at least one floor supervisor on duty for every 200 skaters" during skating sessions. 745 ILCS 72/15(4) (West 2018).

¶ 24 Section 25 provides, in relevant part, that a skater assumes the "inherent risks of roller skating" provided they are not "attributable to an operator's breach of his or her duties as outlined in Section 15." 745 ILCS 72/25 (West 2018).

¶ 25 Section 30 states that the assumption of risk outlined in section 25 "is a complete bar of suit and is a complete defense to a suit against an operator by a roller skater *** for injuries

resulting from the assumed risks of skating unless the operator has violated his or her duties or responsibilities under this Act."  745 ILCS 72/30 (West 2018).

¶ 26    Here, there is no dispute that plaintiff suffered an injury due to one of the "inherent risks of roller skating" recognized in section 25 of the Skating Act.  Therefore, defendants were immune under section 30 unless, at the time of plaintiff's accident, defendants had violated their obligation under section 15(4) to have a "floor supervisor on duty."[3]

¶ 27    The Skating Act does not define "on duty" or specify the qualifications or responsibilities of floor supervisors.  Therefore, we must use the rules of statutory construction to determine the meaning of "on duty" as used in section 15(4) of the Skating Act. See *In re Estate of Walter*, 2023 IL App (1st) 211600, ¶ 41.  In construing a statute, our goal is to ascertain and effectuate the legislature's intent in enacting the provision.  *Estate of Walter*, 2023 IL App (1st) 211600, ¶ 41. When given its plain and ordinary meaning, the statutory language is generally the most reliable indicator of the legislative intent.  *Estate of Walter*, 2023 IL App (1st) 211600, ¶ 41.  It is improper for a court to depart from the statute's plain language by reading in any exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent.  *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18.  Where a term is undefined, we presume that the legislature intended the term to have its popularly understood meaning.  *Hamer*, 2013 IL 114234, ¶ 20.  "In addition to the statutory language, the court may consider the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one

---

[3]There is no dispute that there were fewer than 200 skaters at the time of the incident and, thus, only one floor supervisor was required.

way or the other." (Internal quotation marks omitted.) *State ex rel. Raoul v. Elite Staffing, Inc.*, 2024 IL 128763, ¶ 16.

¶ 28 Where the language of a statutory provision is ambiguous, a court may resort to other aids of statutory construction, including the legislative history and debates, to determine the legislature's intent. *Levine v. City of Chicago*, 2024 IL App (1st) 231245, ¶ 36. A statute is ambiguous if it is reasonably susceptible to multiple meanings. See *Levine*, 2024 IL App (1st) 231245, ¶ 36. Statutory interpretation is a question of law that we review *de novo*. *Hamer*, 2013 IL 114234, ¶ 18.

¶ 29 We consider first whether the term "on duty" is ambiguous and so warrants our examining other aids of construction, such as legislative history. We hold that there is no ambiguity.

¶ 30 On the one hand, defendants contend that having a floor supervisor "on duty" means nothing more than having a floor supervisor physically present. They read the Skating Act not to "impose any limitations, conditions, or exceptions on the immunity of rink operators based on the qualifications or behavior of a floor supervisor." On the other hand, plaintiff argues that "on duty" imposes more than a "mere *** numerical staff requirement[ ]"; he proposes that the Skating Act "aims to ensure the safety of skaters by mandating active and qualified supervision."

¶ 31 Taking defendants' interpretation to its logical extreme, an operator could satisfy its obligation to have a floor supervisor "on duty" by simply assigning an individual who was utterly unable or unwilling to provide any modicum of safety enforcement. This is a far too narrow and mechanical reading given the Skating Act's express purpose of "allocat[ing] *** risks and costs" through "risk reduction techniques" (745 ILCS 72/5 (West 2018)). A mere warm body—as it were—in a floor supervisor's uniform is not a credible "risk reduction technique." Adopting defendants' reading would extend immunity without a corresponding risk reduction, thus

frustrating the Skating Act's remedial purpose and leaving untouched the evils it was meant to address.

¶ 32　Thus, of the two proposed interpretations of "floor supervisor on duty," plaintiff's is the only reasonable one. Given the expressly stated legislative purpose, "floor supervisor on duty" necessarily means an adequately trained individual who is reasonably alert to skaters on the rink floor. Otherwise, an operator could avoid liability merely by posting an untrained and wholly inattentive supervisor on the rink floor. We will not interpret section 15(4) in a way that leads to an absurd result. See *Aasen v. Rickert*, 2018 IL App (2d) 170036, ¶ 22. Nor will we interpret the Skating Act in a way that defeats its aim of providing a reasonably safe skating environment by implementing risk-reduction techniques.

¶ 33　Although this is a case of first impression in Illinois, a case from the New Jersey Appellate Court, *Calhanas v. South Amboy Roller Rink*, 679 A.2d 185 (N.J. Super Ct. App. Div. 1996), supports our interpretation of section 15(4) of the Skating Act. In *Calhanas*, the appellate court was asked to interpret the New Jersey Roller Skating Rink Safety and Fair Liability Act (N.J. Act) (N.J. Stat. Ann. §§ 5:14-1 to 5:14-7 (West 1991)), which was phrased and structured very similarly to the Skating Act. Under section 15:14-4(c) of the N.J. Act, an operator could avoid liability if, among other requirements, it had " 'at least one floor guard on duty for approximately every 200 skaters.' " *Calhanas*, 679 A.2d at 190 (quoting N.J. Stat. Ann. § 5:14-4(c) (West 1991)). As in this case, the defendant roller rink operator in *Calhanas* contended that, because it had provided the required number of guards, it was entitled to immunity from any claim for injury resulting from the alleged negligence of the floor guards in performing their duties. *Calhanas*, 679 A.2d at 190-91. According to the defendant, the "statutory duty to provide floor guards [was] just that—a duty to provide the requisite number of guards—and nothing more." *Calhanas*, 679 A.2d. at 190. The

*Calhanas* court rejected that argument, interpreting the N.J. Act to require more than the mere provision of floor guards: "[n]ecessarily implicit in the duty to post floor guards is a duty to post adequately trained guards who take due care to render competent and watchful supervision." *Calhanas*, 679 A.2d at 191. The court reasoned that, although the N.J. Act (like the Skating Act) "[did] not 'flesh out' what the required floor guards must do once posted, [the N.J. Act] clearly must be construed to require trained, reasonably-alert guards." *Calhanas*, 679 A.2d at 191. The court said further:

> "Reading the [N.J. Act] otherwise would effectively immunize an operator from liability for injuries resulting from guard negligence once it has placed any guards on the floor. That would be a 'result not in accord with the essential purpose and design of the act,' [citations]. The purpose of the [N.J. Act] was not to immunize operators but to afford them more predictable liability exposure by fairly allocating risks and responsibilities among skaters and operators." *Calhanas*, 679 A.2d. at 191.

¶ 34 Although the *Calhanas* decision does not bind us (see *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 276 (2001) (decisions from other jurisdictions do not bind Illinois courts on issues of Illinois law); *People v. Albarran*, 2018 IL App (1st) 151508, ¶ 24 (Illinois courts not obligated to follow courts of sister states, particularly where those decisions involve those states' own statutes)), we find its analysis of a very similar statutory provision to strongly support our interpretation of section 15(4) of the Skating Act.

¶ 35 Defendants' reliance on the First District Appellate Court's decision in *Tomczak* is misplaced. On appeal in *Tomczak* was the grant of summary judgment for the roller rink operator in the plaintiff's suit to recover for injuries she sustained when she fell during skating, allegedly because of a puddle on the rink surface. *Tomczak*, 315 Ill. App. 3d at 1035. The plaintiff argued

that, *inter alia*, (1) in a suit against a roller rink operator for an injury from a defect in the premises, the Skating Act eliminated the common-law requirement that the plaintiff allege and prove that the landowner had actual or constructive notice of the defect; and (2) "Mr. [Loring] Winslow, as the only employee present [at the time of the accident], was not a skate guard, as required by the [Skating] Act, thereby making [the] defendant negligent for not abiding by a provision of the [Skating] Act to provide skate guards or floor supervisors." *Tomczak*, 315 Ill. App. 3d at 1036-37. The appellate court held that the Skating Act did not abrogate the notice requirement. *Tomczak*, 315 Ill App. 3d at 1039. Because the plaintiff failed to establish such notice, the court upheld the grant of summary judgment for the rink operator. *Tomczak*, 315 Ill. App. 3d at 1041. Following that analysis, the court added the following paragraph:

> "Finally, we note that [the] plaintiff has alleged that the [Skating] Act was violated by [the] defendant for failure to have a 'skate guard' on duty as required by paragraph four of section 15 of the [Skating] Act. The [Skating] Act refers to a 'floor supervisor,' not to a 'skate guard.' Nevertheless, Mr. Winslow testified that he was present on November 26, 1996, as the skating supervisor. Therefore, we fail to see any violation of the [Skating] Act." *Tomczak*, 315 Ill. App. 2d at 1041.

¶ 36 The issue in *Tomczak* was simply whether the employee present at the time of the accident was a designated floor supervisor. The issue was *not* whether that designated floor supervisor was qualified for that role or performed competently. Thus, the *Tomczak* court had no occasion to address whether the mere presence of a floor supervisor fulfills section 15(4)'s "on duty" requirement. For that reason, *Tomczak* does not support defendants here.

¶ 37 We reiterate that section 15(4)'s obligation to have a "floor supervisor on duty" is not a mere presence requirement; rather, the operator must provide adequately trained floor supervisors

who are reasonably attentive. The evidence presented during the summary judgment proceeding raised questions of material fact as to whether the floor supervisors on duty when plaintiff suffered his injury were reasonably alert to the danger of the young girls standing still and then skating against the designated flow of traffic.

¶ 38 Plaintiff testified that, after entering the rink floor, he skated with the designated counterclockwise flow of skaters. Just as he entered the rink floor, he saw a male floor supervisor exit the rink floor to talk with a female employee at the skate rental counter. Plaintiff further testified that the floor supervisor had his back to the rink floor as he spoke to the employee. While the floor supervisor was so occupied, the group of girls stood in place on the rink floor, causing others to skate around them. As plaintiff attempted to evade the girls, one of them skated backward and directly into his path, causing him to fall.

¶ 39 No other witness testified to (1) seeing plaintiff fall, (2) seeing the floor supervisor exit the rink floor, or (3) seeing the floor supervisor talk with his back to the rink floor. Robert, the owner and president, testified that (1) the role of a floor supervisor was to "supervise" the rink floor and (2) typically, both a floor supervisor and a DJ would be responsible for such supervision on any given shift. Dominic, the general manager, testified that the floor supervisor was expected to watch the rink floor and that the DJ would watch the rink floor as needed. According to Dominic's understanding of the Skating Act, a floor supervisor did not necessarily have to be on the rink floor at all times but could step away to talk with an employee in the skate rental area if the supervisor was "still able to supervise the rink floor." However, the floor supervisor was allowed to turn his back to the rink floor only if someone else was "supervising" the rink floor.

¶ 40 Strandboe, the assigned floor supervisor on the date of the incident, testified that a floor supervisor was expected to be on the "floor," which included the rink floor and the surrounding

carpet, and to be actively engaged with the skaters. In her view, a floor supervisor "on duty" was "[o]n the floor, observant, paying attention to everyone that is there." According to Strandboe, a floor supervisor needing to leave the rink floor would signal the DJ, who would go on the floor and supervise until the floor supervisor returned. Strandboe testified that she had no recollection of what happened on the incident date.

¶ 41    Lannefeld, the assigned DJ on the date of the incident, testified that one of the measures taken to prevent injuries on the rink floor was to "keep eyes on the floor at all times." That included monitoring the floor, skating over to rule violators, and correcting their behavior. A floor supervisor needing to leave the rink floor would signal the DJ, who would go on the floor until the floor supervisor returned. According to Lannefeld, a floor supervisor "on duty" was "present and actively monitoring the floor—or actively monitoring the rink." However, a floor supervisor could perform that duty without actually being on the rink floor as long as the supervisor was present within the rink area and could monitor the rink floor. Lannefeld did not provide any testimony as to the incident itself.

¶ 42    Based on the deposition testimony, there clearly are questions of material fact as to whether there was adequate supervision of the rink floor when plaintiff encountered the girls whose noncompliant skating allegedly caused his fall. The assigned floor supervisor was not on the rink floor but, with his back turned to the floor, was speaking with another employee in the skate rental area. Although there was testimony that a floor supervisor could monitor the rink floor without being on the floor itself, there are questions of fact as to whether the floor supervisor was able to adequately monitor the floor at the time of plaintiff's injury. Also, although there was testimony that a floor supervisor could signal the DJ to provide backup supervision duties, there is no evidence that either the floor supervisor who left the floor alerted the DJ or that the DJ was

providing backup supervision when plaintiff fell.  Based on the evidence in the summary judgment proceeding, there are clearly questions of material fact as to whether there was active and alert supervision of the rink floor when plaintiff fell.  Accordingly, since it cannot be said as a matter of law that defendants satisfied the "floor supervisor on duty" requirement of section 15(4) of the Skating Act, summary judgment for defendants was improper.[4]

¶ 43                                  B. Premises Liability

¶ 44     We next address defendants' alternative contention that summary judgment on count II was proper because "[p]remises liability claims require the presence of a defect on the property" and plaintiff failed to provide evidence of a "defect on the premises that present[ed] an unreasonable risk of harm."  Plaintiff argues that his premises liability claim need not rest on a "defect" in the premises but can be based on the "fail[ure] to prevent or control foreseeable risks arising from the conduct of [skating] patrons."

¶ 45     Plaintiff is correct.  "Under certain circumstances, a possessor of land may be held liable for physical harm caused to an individual present on the land by a condition on the land [citation] *or by the acts of third persons*."  (Emphasis added.)  *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 437, 445-46 (2006) (complaint properly alleged that restaurant in high traffic area had duty of care to guard against penetration of its building by out-of-control vehicles).  See also 740 ILCS 130/2 (West 2018) (an owner of premises owes entrants a duty "of reasonable care under the

---

[4]Plaintiff does not appear to challenge the trial court's ruling that summary judgment for Robert, Funway's president, was proper on the independent ground that he was not personally responsible for plaintiff's accident.

circumstances regarding the state of the premises *or acts done or omitted on them*" (emphasis added.)).[5] Thus, a premises liability claim need not be based on a physical defect in the premises.

¶ 46 The cases cited by defendants do not support their contention that a plaintiff must prove a physical defect to support a claim for premises liability. In each of the cited cases, the plaintiff claimed liability based on an alleged physical defect in the premises, and the court addressed the issue of whether there was adequate evidence of such a defect. See generally, *e.g.*, *Aalbers v. LaSalle Hotel Properties*, 2022 IL App (1st) 210494; *Garcia v. Goetz*, 2018 IL App (1st) 172204; *Kimbrough v. Jewel Companies, Inc.*, 92 Ill. App. 3d 813 (1981). None of these cases addressed whether a plaintiff who claims premises liability *must* prove a physical defect in the premises. Thus, those cases do not support defendants here.

¶ 47 Plaintiff alleged in count II that his injury resulted from defendants' negligent failure to provide, among other things, proper floor supervision for skaters. During the summary judgment proceeding, there was evidence that defendants negligently failed to provide adequate floor supervision. Therefore, defendants were not entitled to summary judgment on the alternative basis they propose.

¶ 48                                     III. CONCLUSION

¶ 49 For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand for further proceedings.

---

[5]An amendment to the Premises Act that described the duty of "reasonable care" (see Pub. Act 89-7 (eff. Mar. 9, 1995) (amending 740 ILCS 130/2) was held unconstitutional by our supreme court. See *Tomczak*, 315 Ill. App. 3d at 1039 n.1 (citing *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 471 (1997)). Since then, Illinois courts have relied on the common-law standard of care for premises liability claims. *Clifford v. Wharton Business Group*, *L.L.C.*, 353 Ill. App. 3d 34, 42 n.3 (2004).

¶ 50    Reversed and remanded.